David L. RICE, Appellee,

v.

Charles L. WOLFF, Jr., Warden, Nebraska Penal and Correctional Complex, Appellant.

No. 74–1682.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 12, 1974.

Decided Jan. 28, 1975.

Rehearing and Rehearing En Banc Denied Feb. 19, 1975.

Certiorari Granted June 30, 1975.

See 95 S.Ct. 2677.

Mel Kammerlohr, Asst. Atty. Gen., Lincoln, Neb., for appellant.

J. Patrick Green, Omaha, Neb., for appellee.

Before MATTHES, Senior Circuit Judge, and BRIGHT and STEPHENSON, Circuit Judges.

MATTHES, Senior Circuit Judge.

The petitioner in this habeas corpus action, David L. Rice, was convicted in Nebraska state court of the first degree murder of an Omaha policeman, Larry D. Minard, who was killed when a suitcase he was examining exploded. The conviction was affirmed. State v. Rice, 188 Neb. 728, 199 N.W.2d 480 (1972). Petitioner sought habeas corpus relief from the United States District Court for the District of Nebraska, pursuant to 28 U.S.C. § 2254. Chief Judge Urbom, after due consideration, granted the writ.

This appeal by the State of Nebraska for respondent Wolff raises several important questions in the law of search and seizure. At issue is whether Judge Urbom erred in ruling that the search of petitioner's house by members of the Omaha police force was illegal, and that certain evidence seized during that search or as a fruit of the search should have been suppressed at petitioner's trial in state court.

We first review the basic facts precipitating the prosecution and the ensuing court proceedings.

At 2:05 a. m. on Monday, August 17, 1970, an Omaha police radio dispatcher received a telephone call from a 911 operator that someone had reported a woman screaming at 2865 Ohio Street, in Omaha. The dispatcher sent two police cars to that address, and officers in a third vehicle also arrived at the scene. One of the policemen responding was Larry Minard. The house at 2865 Ohio was vacant. As the police entered the structure, they were forced to step over a suitcase lying on its side in the doorway. Several minutes after the police first entered the house, Officer Minard approached the suitcase and apparently was inspecting it when it exploded, instantly killing him. Subsequent investigation established that the suitcase had contained dynamite, which had been wired in such a manner that any movement of the suitcase would detonate the dynamite.

A police task force immediately began an investigation of the bombing. By Saturday morning, August 22, 1970, the investigation began to focus upon one Duane Peak, a fifteen-year-old member of the National Committee to Combat Fascism (NCCF), a political organization known in the community as the Black Panther Party. Specifically, several persons had identified Peak as the individual who had called to report a disturbance at the vacant house on Ohio Street. Moreover, several people had seen Peak some time prior to the murder of Officer Minard with a suitcase similar to the one used in the bombing. The police also had knowledge that Edward Poindexter, an officer in the NCCF, was capable of rigging a booby trap bomb.

The NCCF was well known to the Omaha police. For two years prior to the murder of Minard, the police had maintained an intelligence file on the NCCF and a predecessor organization, the United Front Against Fascism. The file included publications of the NCCF, some of which contained articles by Poindexter or petitioner advocating violence against the police and others.

On Saturday afternoon, August 22, warrants were issued for the arrest of Peak and Poindexter, and the Omaha police force began a city-wide search for the two suspects. Since the police had no specific information or tips as to the whereabouts of Peak or Poindexter, police officials listed the various places where it was believed the two might be located and instructed police teams to visit or search the various locations.

Among the places searched or visited on Saturday afternoon and evening were the NCCF headquarters at 3508 North 24th Street, the residence of one of the suspects, and the homes of certain of their relatives and associates.

By Saturday evening Edward Poindexter had been apprehended. Peak, however, the prime suspect in the case, was still at large. The police believed that members of the NCCF were searching for Peak in order to eliminate him, since he supposedly could incriminate others in the NCCF as accomplices in the bombing. Consequently, the police search for Peak continued.

At 10:30 Saturday night policemen in search of Peak arrived at the home of David Rice, the petitioner, at 2816 Parker Street. Petitioner was known to the police as an officer in the NCCF. Based on testimony credited by Judge Urbom at an evidentiary hearing in the district court, it appears that the only reasons for placing petitioner's house on the list of places to be searched were that both petitioner and Peak were members of the NCCF and Peak had been in petitioner's house some weeks previously.

Lights and a television were on in the petitioner's home when the police arrived, but there was no response to the officers' knock at the door. The leaders of the police team, Sergeants Swanson and Pfeffer, decided not to forcibly enter the house immediately. Instead, they proceeded to the office of a Municipal Court Judge, made an affidavit, and obtained a search warrant while the other officers encircled petitioner's house and waited. Swanson and Pfeffer returned an hour or more later with the search warrant, and petitioner's house was finally entered by the police with the two-fold purpose of searching for and arresting Peak and searching for dynamite believed in the possession of the NCCF.

Peak was not in the house. But the police discovered, assertedly in plain view, fourteen sticks of dynamite, blasting caps, wiring, a battery, and a pair of long-nosed pliers.

Peak was subsequently arrested, and on August 27 petitioner voluntarily surrendered. The clothing petitioner was wearing at the time of his arrest was seized by the police and subjected to chemical analysis for dynamite particles.

Poindexter and petitioner subsequently were tried jointly for first degree murder. Both moved the state trial court to suppress various items seized by the police, including those seized during the search of petitioner's house and the clothing seized from petitioner upon his arrest.[1] The state trial court denied the motion to suppress, ruling that the search was legal pursuant to a valid search warrant.

At the trial, Peak implicated Poindexter and petitioner in the bombing plot. As corroborative evidence, the State introduced many of the items seized at the petitioner's house during the search of August 22, and introduced the results of the chemical analysis of petitioner's clothing seized at the time of his arrest. The analysis indicated that dynamite granules were in the pockets of the trousers. Both defendants were convicted by a jury on April 17, 1971. Petitioner was sentenced to life imprisonment.

On appeal to the Supreme Court of Nebraska, the primary attack by Poindexter and petitioner was upon the trial court decision to deny the motion to suppress. Specifically, they contended that the trial court erred in upholding the validity of the search warrant. The State defended the ruling of the district court, but further argued that even if the search warrant was improper, entry into petitioner's house was reasonably and properly undertaken in search of Duane Peak, and the evidence discovered

---

1. Petitioner contended in both the state courts and in the federal district court that the search of his clothing was based solely upon information obtained from the alleged illegal search of his house, and that the results of the chemical analysis of the clothing were therefore fruit of the poisonous tree. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The district court so held, and the State has not attacked that ruling on appeal.

in plain view during this search pursuant to a valid arrest warrant was admissible at trial. The two defendants attacked this alternative ground of search to arrest in their reply brief.

The state supreme court affirmed the convictions of both men on July 18, 1972, ruling that the search of petitioner's home was pursuant to a valid search warrant. The court did not consider whether entry into petitioner's home could be justified as one in search of Peak. *See* State v. Rice, *supra.*

On September 29, 1972, petitioner filed this petition for writ of habeas corpus in the federal district court in Nebraska. Petitioner urged that his sentence was unlawful because the underlying conviction was based upon evidence seized in violation of the fourth and fourteenth amendments to the United States Constitution.

Judge Urbom filed a memorandum on March 30, 1974, 388 F.Supp. 185 (D.Neb. 1974), ruling that the affidavit for the search warrant was fatally defective and that consequently the search warrant was invalid. The district court ordered a hearing on the alternative ground asserted by the State as legally justifying the entry and search of the residence. An evidentiary hearing was held, and on July 5, 1974, Chief Judge Urbom filed an opinion, 388 F.Supp. 195 (D.Neb.1974), finding that the police did not have

probable or reasonable cause to enter the petitioner's house in search of Peak, and that the search was therefore wholly unlawful. Habeas corpus relief was granted: petitioner was ordered released from custody unless he was granted a new trial within 90 days of the district court decision or within 90 days of an appellate court decision affirming the district court order, whichever was later. This appeal by the State of Nebraska for respondent Wolff followed.

## I.

We turn first to the ruling of the district court that the warrant to search the petitioner's house was invalid. It is fundamental constitutional law, of course, that a search warrant may issue only upon a showing that there is probable cause to believe that the item sought is located on the premises for which the search warrant is requested. United States v. United States District Court, 407 U.S. 297, 316–317, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); Aguilar v. Texas, 378 U.S. 108, 112, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Nathanson v. United States, 290 U.S. 41, 47, 54 S.Ct. 11, 78 L.Ed. 159 (1933). The district court found that the warrant in the instant case was invalid because the affidavit submitted by the two police sergeants to the magistrate was insufficient to establish probable cause.[2] Spinelli v. United

---

2. The affidavit submitted to the magistrate was as follows:

> The complaint and affidavit of Sgt. R. Pfeffer and Sgt. Jack Swanson, on this 22 day of August 1970, who, being first duly sworn, upon oath says:
> That he has just and reasonable *grounds* to believe, and does believe that there is concealed or kept as hereinafter described, the following property, to-wit: Dynamite and devices which could be used to construct devices which could cause injury to persons and damage to property. Also illegal weapons which he stated should be used against Police Officers.
> That said property is concealed or kept in, on, or about the following described place or person, to-wit: A one story white frame house on Parker Street at 2816, In Omaha Douglas County, Nebraska.
> That said property is under the control or custody of David Lewis RICE, Minister of

Information, National Comittee [sic] to Combat Fascism.

That the following are the grounds for issuance of a search warrant for said property and the reasons for his belief, to-wit: David Rice is a known member of the National Comitte [sic] to Combat Fascism, which advocates the violent killing of Police Officers. A violent killing of a Police Officer occured [sic], in Omaha, and arrests were made from the membership of the NCCF. We have been told in the past that RICE keeps explosives, at his residence, and also illegal weapons, which he has said should be used against Police Officers.

A warrant authorizing a night-time search is requested because Nighttime when information was secured, and the property may be removed.

Apparently, the only evidence of probable cause submitted to the magistrate was the officers' affidavit. The State does not contend

States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); Aguilar v. Texas, *supra.*

The state trial court on the motion to suppress and the state supreme court on appeal had ruled that the search warrant was supported by probable cause and therefore valid. In considering that probable cause had been shown, the state courts did not limit themselves to an examination of the affidavit before the magistrate. Rather, the state courts relied, in part at least, upon testimony adduced at the suppression hearing. Evidence at that hearing arguably showed that the police had had probable cause to search petitioner's home, although the circumstances permitting the police to reach such a conclusion were for the most part not revealed to the magistrate at the time the search warrant was issued.

#### A.

The State contends that the federal district court should not have limited itself to an examination of only the affidavit of Pfeffer and Swanson in determining if the search. warrant was supported by an adequate showing of probable cause. But the refusal of Judge Urbom to consider any facts or circumstances not revealed to the magistrate is amply supported by the opinions of the United States Supreme Court. Spinelli v. United States, *supra,* 393 U.S. at 413 n. 3, 89 S.Ct. 584; Aguilar v. Texas, *supra,* 378 U.S. at 109 n. 1, 84 S.Ct. 1509. *See also* Whiteley v. Warden, 401 U.S. 560, 565 n. 8, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971).

By urging that the district court should have allowed the State at a suppression hearing subsequent to the search to rehabilitate the assertedly inadequate affidavit for the search warrant, the State is in effect suggesting that even in the absence of exigent circumstances the police should be permit-

that the affidavit was supplemented by any oral testimony of the officers before the magistrate.

**3.** Since we are here considering the search warrant in fact obtained by the police, we

ted to conduct searches on their own assessment of probable cause, subject to the post hoc ratification of that assessment by the judiciary.[3] *Cf.* United States v. Chavez, 482 F.2d 1268, 1270 (5th Cir. 1973). Such a procedure would be contrary to the previous teachings of the Supreme Court as to the policies to be furthered by the warrant requirement of the fourth amendment, and in no way would protect innocent citizens from unreasonable searches by police officers who had erred in assessing the existence of probable cause to search the particular premises. As Mr. Justice Jackson observed in Johnson v. United States, 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948):

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. . . . When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

Also, *see* Chimel v. California, 395 U.S. 752, 760–762, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

Nevertheless, the State cites two Supreme Court opinions, Draper v. United

need not consider at this time those cases permitting law enforcement officials to act upon their own assessment of probable cause if exigent circumstances preclude the opportunity to seek a timely search warrant.

States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), and Whiteley v. Warden, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), for the proposition that a showing before the magistrate of probable cause to search can be supplemented by information or circumstances known to the police officers but not disclosed to the magistrate issuing the warrant. The two decisions, however, do not stand for this principle.

There was no warrant of any kind involved in *Draper.* Rather, law officers arrested a heroin trafficker on a tip that he would be carrying heroin. Essential to an understanding of the *Draper* case is the realization that in certain instances a law enforcement officer may arrest without an arrest warrant if he, rather than a magistrate, has probable cause to believe that a crime is being committed. The Supreme Court in *Draper* held that a valid warrantless arrest of a suspect had been made because a post-arrest hearing showed that so much of the informer's tip had been verified by police observation that it was reasonable for the police to conclude that the informant's information that the suspect was carrying heroin was reliable, thereby establishing probable cause for arrest. Although *Draper* is valuable for providing a test on how much of the detail of an unsubstantiated informer's tip must be verified by police before the tip can be considered reliable grounds supporting a finding of probable cause, *see* Spinelli v. United States, *supra,* 393 U.S. at 416–417, 89 S.Ct. 584; United States v. Marihart, 472 F.2d 809, 812–814 (8th Cir. 1972), *Draper* does not render support to the proposition that a probable cause affidavit for a search warrant can be rehabilitated after the fact.

In *Whiteley,* a Wyoming sheriff had obtained an arrest warrant from a magistrate, but upon an affidavit which did not adequately show that there was probable cause to arrest the suspects named. The Supreme Court specifically held, 401 U.S. at 565 n. 8, 91 S.Ct. 1031, that the affidavit could not be rehabilitated in a post-arrest hearing by information known to the sheriff but not disclosed to the magistrate. The Court further held that the arresting officers did not have probable cause to make a warrantless arrest.

Neither case undermines the principles that a search warrant is valid only if probable cause has been shown to the magistrate and that an inadequate showing may not be rescued by post-search testimony on information known to the searching officers at the time of the search.

The State points out that the police officers in this case at least attempted to obtain a search warrant, and contends that the district court's refusal to judge probable cause on anything other than information revealed to the magistrate "penalizes" those officers who attempted to comply with the warrant requirement and "rewards" those who do not. Such an argument misapprehends the requirements and policies of the fourth amendment. For the reasons outlined above in the statement by Mr. Justice Jackson, the fourth amendment mandates that except in limited instances the police must submit the question of whether there is probable cause to search to the judgment of a neutral and detached magistrate. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); United States v. Bozada, 473 F.2d 389, 390–391 (8th Cir.), cert. denied, 411 U.S. 969, 93 S.Ct. 2161, 36 L.Ed.2d 691 (1973). "Only in exigent circumstances will the judgment of the police as to probable cause serve as sufficient authorization for a search." Chambers v. Maroney, *supra,* 399 U.S. at 51, 90 S.Ct. at 1981. Thus the requirement that probable cause be shown to the magistrate is not intended as "punishment," but rather is intended to protect basic fourth amendment rights of citizens. Likewise, a law enforcement officer who fails to seek a search warrant is not being "rewarded": unless he can point to exigent circumstances precluding the opportunity to apply for a warrant, he is required to have the presence of probable cause to search determined

by a magistrate, and the failure to do so for the sole purpose of avoiding a review of probable cause will result in the search being held illegal.

Therefore, we hold that the district court did not err in reviewing the sufficiency of the showing of probable cause to issue the search warrant solely in light of the affidavit of probable cause submitted to the Municipal Court Judge acting as magistrate.

### B.

We now consider the ruling of the district court that the affidavit, viewed alone, did not make an adequate showing of probable cause to justify issuance of the search warrant. A study of the affidavit reveals that the officers' averment of probable cause to search was primarily based upon an informant's tip. Specifically, the only averment in the affidavit of criminal activity or of evidence of criminal activity in petitioner's house was the statement:

> We have been told in the past that RICE keeps explosives, at his residence, and also illegal weapons, which he has said should be used against Police Officers.

■ In Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), the Supreme Court specified what information is necessary to show probable cause in an affidavit relying upon an informant's tip. First, there must be evidence allowing the magistrate to conclude that the informant is himself trustworthy. Second, there must be a sufficient showing of the underlying circumstances on which the informant based his information to enable the magistrate to determine that the informant's tip is reliable and not based on mere rumor. In Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), the Supreme Court further refined *Aguilar* by holding that an affidavit deficient under the *Aguilar* test is nevertheless sufficient if averments in the affidavit, aside from the tip, so corroborate the tip that

it is "as reliable as one which passes *Aguilar's* requirements when standing alone." 393 U.S. at 416, 89 S.Ct. at 589. *See* United States v. Cummings, 507 F.2d 324 (8th Cir. 1974); United States v. Marihart, *supra,* 472 F.2d at 813.

■ It is apparent that the affidavit filed by Sergeants Pfeffer and Swanson in this case does not meet either criterion of the *Aguilar-Spinelli* test.[4] The affidavit contains no averments from which the magistrate could conclude that the informant was reliable and trustworthy. Nor could the magistrate determine from the affidavit that the informant's tip was based upon more than mere rumor and speculation. The averments of the affidavit that petitioner was a member of the NCCF and that NCCF members had already been arrested in the case possibly enhanced the suspicion that petitioner in some way was involved with the bombing plot, but these allegations do not serve to independently corroborate the tip that weapons and explosives were in the petitioner's house.

The Supreme Court stated in Spinelli v. United States, *supra,* 393 U.S. at 416, 89 S.Ct. at 589:

> In the absence of a statement detailing the manner in which the information was gathered, it is especially important that the tip describe the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation.

The principal shortcoming in the affidavit presently under review is that the only corroboration of the informant's tip is the petitioner's reputation as a member of the NCCF, precisely the type of vague and nebulous corroboration condemned in the above passage from the *Spinelli* opinion.

■ The State, however, directs our attention to United States v. Harris, 403

---

**4.** Indeed, the state trial court found that the affidavit, if not rehabilitated by evidence not disclosed to the magistrate, failed to comply with the requirements of *Aguilar* and *Spinelli.*

U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971), in which a plurality of the Supreme Court indicated that it was willing to relax the standards for judging the reliability of informants' tips. The State suggests that this court should do likewise. But *Aguilar* and *Spinelli* have not been overruled, and this court previously has stated subsequent to *Harris* that it will continue to apply the standards of *Aguilar* and *Spinelli* in the absence of a more definitive ruling by the Supreme Court. United States v. Marihart, *supra,* 472 F.2d at 813 n. 5; LeDent v. Wolff, 460 F.2d 1001, 1003 (8th Cir. 1972).[5]

The decisions of the Supreme Court convincingly demonstrate, and we so hold, that the district court was left with no choice but to conclude that the affidavit of Sergeants Pfeffer and Swanson was insufficient to establish probable cause. Consequently, the district court was correct in holding that the search warrant was invalid.

## II.

The State urges that even if the federal district court was correct in ruling that the search warrant was invalid, the court erred in holding that the police officers could not legally enter the petitioner's house in search of Duane Peak, for whom the police had a valid arrest warrant. If the police could legally enter the house in search of Peak, then it is likely that the seizure of the dynamite and related paraphernalia was proper, since it appears from the record that the incriminating evidence probably was in plain view inside the house.

### A.

As a preliminary matter, the State contends that the federal district court should not have considered the question whether the police could legally enter petitioner's home in search of Peak. Instead, the State argues, Judge Urbom should have dismissed the petition on the ground that the petitioner had not exhausted his state remedies for relief on this alternative ground, since no Nebraska state court has ever ruled on the specific question of whether the police could enter petitioner's house in search of Peak. The State thus submits that the state courts should be allowed to rule on this question before a federal district court construes it. Judge Urbom rejected this suggestion. We find that he was correct in doing so.

It is, of course, settled law that federal habeas corpus will not be granted to a state prisoner unless he has exhausted all available state remedies. 28 U.S.C. §§ 2254(b) & (c). This doctrine of exhaustion of state remedies is a rule designed to harmonize the relationship between the federal judiciary and the state court systems, for "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation." Darr v. Burford, 339 U.S. 200, 204, 70 S.Ct. 587, 590, 94 L.Ed. 761 (1950).

But there are limits to the scope of the exhaustion doctrine, and the exhaustion standard is not an inflexible requirement: it is a rule of comity and not a rule limiting the power of the fed-

---

**5.** Even if the *Harris* reasoning were applied to the present affidavit, it is apparent that the affidavit would still be deficient. In *Harris,* the affidavit at least met one half of the *Aguilar* test, since it averred that the informant's tip was derived from personal observation and therefore was based upon reliable information.

The significance of the *Harris* opinion is that it upheld the affidavit even though the trustworthiness of the informant was not shown. But the *Harris* affidavit contained additional indicia that the informant was reliable: the informant was making an admission against

penal interest; the tip was highly detailed, further suggesting personal observation; and the conduct attributed by the informant to the property owner was consistent with the owner's criminal reputation. The affidavit in our case contains no such corroboration suggesting the informant's trustworthiness or the reliability of his information. Petitioner's reputation *as a member of the* NCCF is insufficient in itself to substantiate a tip that his house contained explosives. *See generally* 85 Harv. L.Rev. 3, 53 (1971).

eral courts to give habeas relief. Smith v. Wolff, 506 F.2d 556 (8th Cir. 1974). Thus the Supreme Court has held that the exhaustion provisions of § 2254 refer only to those remedies still open to the habeas petitioner at the time he files his petition in the federal district court. Humphrey v. Cady, 405 U.S. 504, 516, 92 S.Ct. 1048, 31 L.Ed.2d (1972); Fay v. Noia, 372 U.S. 391, 434–435, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). Similarly, it is not necessary that the state courts must have ruled on the merits of an issue before the question can be considered by the federal judiciary in a habeas action. United States ex rel. Meadows v. State, 426 F.2d 1176 (2d Cir. 1970), cert. denied, 401 U.S. 941, 91 S.Ct. 944, 28 L.Ed.2d 222 (1971); Losieau v. Sigler, 421 F.2d 825 (8th Cir. 1970). It is enough that the state courts have been presented the opportunity to rule on the questions raised by the petitioner in his federal petition. Picard v. Connor, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).

There is no question that the petitioner in this case presented to both the state trial court and the state supreme court his claim that the search of his house was illegal. Specifically, he asserted that the search warrant on which the search was based was deficient. Obviously, petitioner was not required to anticipate all the possible defenses the State might assert to his claim that the search of his house was illegal. In fact, the State did not pose the alternative ground of a search to arrest Peak at the suppression hearing, but rather first asserted that possible justification for the search during petitioner's appeal to the Supreme Court of Nebraska.[6] Nevertheless, the Supreme Court of Nebraska declined the opportunity to consider this alternative ground, and declined also to order further factfinding on the matter. Instead, the court ruled that the search warrant was valid.

Moreover, it is clear that on the facts of this case petitioner had no effective remedy still available in the state courts when he filed his federal habeas petition. The state supreme court had already ruled on direct appeal that the search warrant was valid. Any attempt by petitioner to seek post-conviction relief in the state courts surely would have been rejected on the ground that, regardless of whether the police legally could have entered petitioner's house to search for Peak, the state supreme court had rendered consideration of the issue unnecessary by holding that the search warrant was valid. Clearly, any attempt by petitioner to further attack the search of his house as illegal in any state post-conviction proceeding would have been an exercise in futility. See Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971); United States ex rel. Condon v. Erickson, 459 F.2d 663 (8th Cir. 1972). Cf. Evans v. Cunningham, 335 F.2d 491 (4th Cir. 1964). The intervening circumstance of the search warrant being held invalid, thereby creating the possibility of a new avenue for relief in the state courts, occurred only after the filing of petitioner's federal habeas petition—as a direct consequence of that filing.

We consider Roberts v. LaVallee, 389 U.S. 40, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967), to be analogous authority for the proposition that the petitioner need not seek further relief in the state courts before applying for federal relief. In *Roberts,* a New York criminal defendant sought from the state trial court a free transcript of a prior preliminary hearing. The request was denied and the defendant was eventually convicted. On the subsequent appeal the propriety of the denial of the free transcript was raised, but the defendant's conviction was affirmed. The defendant then sought federal habeas relief. After his federal petition was denied by the district court, a state appellate court decision in an unrelated case ruled that the denial of a free transcript of a preliminary hearing was

---

**6.** Indeed, the State used one-third of its 54-page brief in the state supreme court to recite parts of the voluminous trial record from which the State believed the court could rule

that entry into petitioner's house was legal as a search for Peak, even if the search warrant was defective.

a denial of equal protection under both the federal and state constitutions. The Court of Appeals for the Second Circuit declined to rule on the defendant's appeal from the denial of federal habeas relief because the "constitutional necessity for federal court intervention" was "open to doubt" in light of the recent state appellate court decision and the likelihood of relief in the state court if the defendant filed a state post-conviction motion. The United States Supreme Court reversed, noting that Congress in enacting the exhaustion requirement of 28 U.S.C. § 2254 had "not intended 'to require repetitious applications to the state courts.'"

██ We believe that the *Roberts* opinion supports our holding that petitioner has exhausted his state remedies and need not return to the state courts to further litigate the legality of this alternative ground arguably justifying the search, a ground which was raised before the state supreme court but which the court declined to consider or inquire into.

Our holding in *Goham v. Wolff*, 471 F.2d 52 (8th Cir. 1972), cert. denied sub nom., *Tyndall v. Wolff*, 414 U.S. 834, 94 S.Ct. 174, 38 L.Ed.2d 69 (1973), is not to the contrary. In *Goham*, unlike in *Roberts* and the present case, the intervening circumstances creating the renewed possibility of obtaining relief in the state courts occurred before the prisoner filed his petition for federal habeas corpus relief. Thus the petitioner in *Goham* could have sought relief just as easily and effectively in the state courts as in the federal judiciary. In our case, however, the petitioner had no effective state remedy available when he filed his federal petition. Moreover, to send the petitioner back to the state courts, over two years after the filing of his federal habeas motion, to assert a question which the state supreme court previously had before it, is manifestly unreasonable, and we do not believe that the law requires such a result. In any event, the holding in *Goham* probably has been weakened by a subsequent decision of the United States Supreme Court reaffirming the teachings of *Roberts v. La-Vallee*. *Francisco v. Gathright*, 419 U.S. 59, 95 S.Ct. 257, 42 L.Ed.2d 226 (1974). As we noted in *Losieau v. Sigler*, *supra*, 421 F.2d at 828:

> The doctrine of exhaustion of state remedies is only a rule of comity and need not be mechanically applied where the state court, for procedural reasons, has once refused to pass upon the merits of the question. In any event, once jurisdiction is asserted and the federal district court has conducted a full evidentiary hearing, it would be a waste of judicial machinery to require a second evidentiary hearing by another court which exerts only concurrent jurisdiction.

We hold that the petitioner has exhausted his state remedies, and that the district court did not err in considering petitioner's claim that the entry by police into his home to search for Duane Peak was illegal. *See, e. g.,* Roberts v. LaVallee, *supra;* Francisco v. Gathright, *supra;* Losieau v. Sigler, *supra;* Smith v. Peyton, 413 F.2d 760 (4th Cir. 1969); Hawkins v. Robinson, 367 F.Supp. 1025 (D.Conn.1973). *Cf.* United States ex rel. Condon v. Erickson, 459 F.2d 663 (8th Cir. 1972).

### B.

Finally, we reach the argument to which the State devotes most of its brief in this court: even if the search warrant for the petitioner's house was invalid, police officers legally could enter the house in search of Peak in order to arrest him.

██ Police entry into a private dwelling without a search warrant in search of a suspect for whom an arrest warrant has been issued carries precisely the same fourth amendment implications as entry into a dwelling to make a warrantless search for tangible property. Citizens are entitled to the same constitutional protection from unreasonable searches and seizures when the police are seeking a suspect for arrest as when they are seeking some contraband for evidence. Thus, "arrest warrants are

not substitutes for search warrants." Government of the Virgin Islands v. Gereau, 502 F.2d 914, 928 (3rd Cir. 1974).

Consequently, we hold, as have several other courts of appeals, that the fourth amendment mandates, as a minimum, that police officers may not enter the dwelling or premises of a third person in search of a suspect for whom they have a valid arrest warrant unless they have reasonable or probable cause to believe that the suspect is within.[7] Government of the Virgin Islands v. Gereau, *supra;* United States v. Phillips, 497 F.2d 1131 (9th Cir. 1974); Fisher v. Volz, 496 F.2d 333 (3rd Cir. 1974); United States v. Brown, 151 U.S.App.D.C. 365, 467 F.2d 419 (1972); United States v. McKinney, 379 F.2d 259 (6th Cir. 1967). *Cf.* Lankford v. Gelston, 364 F.2d 197 (4th Cir. 1966). *See also* United States v. Shye, 492 F.2d 886 (6th Cir. 1974) (opinion of district court as appendix); United States v. Watson, 307 F.Supp. 173 (D.C.D.C.1969). To hold otherwise would carve out an exception to the constitutional requirement that citizens are to be secure from unreasonable searches and seizures, for the Supreme Court noted in Chambers v. Maroney, *supra,* 399 U.S. at 51, 90 S.Ct. at 1981:

> In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution.

The State insists that the police officers did indeed have probable cause to believe that Peak was inside when they entered petitioner's house on August 22. After an evidentiary hearing on this question, Judge Urbom found that the police did not have such probable cause. We agree.

In an effort to show that the police had probable cause to believe that Peak was in the house, the State refers to numerous places in the substantial record where it was shown that the police knew at the time of the search that Peak, Poindexter, and petitioner were members of the NCCF; that petitioner and Poindexter could fabricate a bomb; and that Peak probably had a role in the bombing. But none of this evidence, or at least none credited by Judge Urbom, shows that the police had a firm, concrete, and otherwise reasonable belief that Peak was at the petitioner's house when they entered it. It is one thing to know that Peak is a member of the NCCF suspected of helping lure a policeman to his death and quite another to know that Peak is at the petitioner's house or even that petitioner may have explosives stored in his home.[8]

In fact, the testimony of the various police officers at the evidentiary hearing held before the district court strongly suggests that the police had no evidence whatever that Peak was at petitioner's house and that they were acting on nothing more than a hunch or random guess. The statements of Sergeants Pfeffer and Swanson, the leaders of the search, as well as one of their superiors, Lieutenant Perry, show that the Omaha police had made a list of the locations where Peak might be found, based on his prior habits and associations. The petitioner's house, as well as the homes of other friends and relatives of Peak and Poindexter, were to be searched in accordance with this list. Thus, for example, Sgt. Swanson testified:

---

7. Given the factual setting of the cases before us, we need not consider whether the police officers should have obtained a valid search warrant before entering petitioner's home in search of Peak. It is not yet settled whether the Constitution requires not only that the policeman have probable cause to believe that the suspect sought for arrest is within the premises but also that, absent exigent circumstances, he obtained a search warrant. *Compare* United States v. McKinney, 379 F.2d 259,

262–263 (6th Cir. 1967), *with* United States v. Shye, 492 F.2d 886, 891 (6th Cir. 1974). *See generally,* Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L.Rev. 349, 360 (1974); Note, The Neglected Fourth Amendment Problem in Arrest Entries, 23 Stanford L.Rev. 995 (1971).

8. Indeed, at the time of the search of petitioner's home, the police apparently had no evidence or tips specifically tying petitioner to the bombing plot.

Q. Did you have any report from anyone that Duane Peak was then inside the Rice house or had been inside the Rice house that day?

A. No, sir. The only thing we had was a speculation because it was a known house of that particular group and he was a member of that group and it was a place where he might possibly be.

Clearly, such speculation is not a reasonable ground justifying the invasion of citizens' privacy.

■ The State, however, points to certain testimony given by Lt. Perry at the federal district court hearing which suggests that he had been told by relatives of Duane Peak that Peak was a constant companion of petitioner and Poindexter and that the bomb which killed Officer Minard was made at petitioner's house. The State urges that the district court should have found that the police had probable cause to enter petitioner's house based on this testimony. But Judge Urbom discredited this testimony after finding that it was uncorroborated and indeed contradicted by the rest of the record. 388 F.Supp. at 199. We have stated before in reviewing factual determinations of a district court hearing a habeas petition that this court "will not retry issues of fact or substitute its judgment with respect to such issues for the judgment of the trial court." Shultz v. State of Nebraska, 353 F.2d 81 (8th Cir. 1965). "It was the

province of the District Court to make credibility determinations." Stidham v. Wingo, 482 F.2d 817, 820 (6th Cir. 1973); King v. Beto, 429 F.2d 221 (5th Cir. 1970), cert. denied, 401 U.S. 936, 91 S.Ct. 921, 28 L.Ed.2d 216 (1971). After reviewing the record, we find that Judge Urbom's decision to discredit this particular testimony was amply supported by the record and was not clearly erroneous.[9]

The State cites the Supreme Court opinion in Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), and urges that police entry into a dwelling in search of a suspect, without probable cause to believe that he is within, may be constitutionally reasonable if certain exigent circumstances exist. But in *Hayden* the police in fact had probable cause to believe that the suspect was within the dwelling searched, and the *Hayden* opinion does not suggest that exigent circumstances may eliminate the need for police to have probable cause to believe the suspect is inside the premises to be searched.[10]

■ As we noted above by our reference to the Supreme Court opinion in Chambers v. Maroney, the minimum requirement for a reasonable search permitted by the Constitution is the existence of probable cause. *Hayden* and numerous other similar fourth amendment opinions of the Supreme Court stand for the principle that the additional constitutional requirement that the existence of

9. We are constrained to observe that, even if the district court had credited the particular testimony of Lt. Perry in question, it is still doubtful that the police had probable cause to enter the house in search of Peak. *Cf.* United States v. Shye, *supra,* 492 F.2d at 890 n.4.

10. In *Hayden,* an armed robber was pursued by two taxi drivers who saw him enter a certain house. Within minutes the police arrived and entered the house pointed out to them by the two drivers. 387 U.S. at 297, 87 S.Ct. 1642. The police clearly had every reason to believe the robbery suspect was still inside the house.

Dorman v. United States, 140 U.S.App.D.C. 313, 435 F.2d 385 (1970), and Salvador v. United States, 505 F.2d 1348 (8th Cir. 1974), are both distinguishable. In each case the court upheld the entry of a dwelling by law officers without a search warrant seeking a suspect under exigent circumstances, but each court explicitly found that the officers had probable cause to believe that the suspect was within. Nevertheless, there is language in *Dorman* intimating that, despite the absence of probable cause, entry into a dwelling in search of a suspect may be justified in certain instances by exigent circumstances. To the extent that *Dorman* so holds, we respectfully disagree. Moreover, the very court which rendered the *Dorman* opinion has ruled without qualification subsequent to *Dorman* that police must have probable cause before entering the dwelling of a third party in search of a suspect. United States v. Brown, 151 U.S.App.D.C. 365, 467 F.2d 419 (1972). As we noted above, other courts of appeals have held likewise. *See, e. g.,* Fisher v. Volz, *supra*; United States v. Phillips, *supra.*

this required probable cause be determined initially by a magistrate upon application for a search warrant need not be observed if certain exigent circumstances prevail which prevent the law officers from timely obtaining a search warrant. *See* Fisher v. Volz, *supra*; United States v. Rubin, 474 F.2d 262, 268 (3rd Cir. 1973). *See also* Camara v. Municipal Court, 387 U.S. 523, 534–535, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

The State, however, points to several state appellate court decisions relating to searches for explosives and bombs, and urges that in an exigent situation when the police are searching for a bombing suspect or bomb components, the degree of probable cause required to render a search reasonable is lessened or eliminated.[11] *See, e. g.,* People v. Superior Court, 6 Cal.App.3d 379, 85 Cal.Rptr. 803 (1970). We note, however, that none of the cases cited holds that the probable cause requirement of the fourth amendment may be obviated by the exigencies of searching for a bombing suspect or explosives. Moreover, in light of what we have said above, we have serious doubts that the State's argument is in harmony with the provisions of the Constitution. *See, e. g.,* notes 10 and 11 *supra.* But in any event we need not consider this contention of the State, for we find that the district court did not

err in ruling that on the record of this case the State has not shown exigent circumstances which could justify this search, even under the State's own theory on the law of probable cause.

The argument by the State that the Omaha police did not have to meet as stringent a probable cause standard in searching for Peak or the explosives in petitioner's house is primarily based upon two asserted exigent circumstances: 1) that the police officers feared that explosives possibly stored in the house might explode; and 2) that the officers believed that other NCCF members might be in the process of eliminating Peak inside the house.

The conduct of the police upon arrival at petitioner's home, however, erodes the exigent circumstances argument. After receiving no response to their knock on the door, the officers decided to obtain a search warrant. After a delay of more than an hour the police finally entered the house, eventually discovering the dynamite and other items admitted at trial.

The delay of more than an hour before entering the dwelling impairs the State's contention that the police were constrained by a sense of urgency to act swiftly, without regard to the mandates of the fourth amendment. Nor, apparently, did the police make any attempt to protect neighboring residents in the

---

11. In Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), and See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967), the Supreme Court recognized that probable cause is the constitutional measure of the reasonableness of a search, but modified the degree of probable cause required to make an administrative search reasonable by focusing on the governmental interest sought to be furthered by that type of search: for example, a non-hostile search by health or fire officials to preserve the health and safety of all residents. There is nothing in either opinion to suggest that the degree of probable cause which must be shown to execute a criminal search ought to be modified in exigent circumstances. *See generally* Note, The Law of Administrative Inspections: Are Camara and See Still Alive and Well?, 1972 Wash.U.L.Q. 313.

Significant for the purposes of the appeal before us is the following language from *Ca-*

*mara, supra,* 387 U.S. at 534–535, 87 S.Ct. at 1734.

> In cases in which the Fourth Amendment requires that a warrant to search be obtained, "probable cause" is the standard by which a particular decision to search is tested against the constitutional mandate of reasonableness. To apply this standard, it is obviously necessary first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interest of the private citizen. For example, in a criminal investigation, the police may undertake to recover specific stolen or contraband goods. But that public interest would hardly justify a sweeping search of an entire city conducted in the hope that these goods might be found. Consequently, a search for these goods, even with a warrant, is "reasonable" only when there is "probable cause" to believe that they will be uncovered in a particular dwelling.

area from any asserted danger of explosion. Moreover, testimony before Judge Urbom suggests that the purpose of searching for explosives was an afterthought conceived after the police arrived at the house, rather than an urgent emergency, and that they decided to apply for a warrant to search for explosives in the petitioner's house only because they had not discovered dynamite in any of the other locations they had searched earlier in the day.

As for the apprehension that Peak was being killed, the delay of more than an hour before entering the house greatly attenuates the force of this argument.

We find that Judge Urbom did not err in ruling that there existed no exigent circumstances justifying the police search of petitioner's home without probable cause.

### III.

We have read the brief of the amici to this court, The International Association of Chiefs of Police and Americans for Effective Law Enforcement, and we note their suggestion that we evaluate the application of the exclusionary rule in this case in light of the Supreme Court opinion in Michigan v. Tucker, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). But the Court in *Tucker* did not overturn the exclusionary rule, and it is still the law of the land. We are obliged to apply that law. In *Tucker*, Mr. Justice Rehnquist, writing for the Court, observed:

> The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused.

417 U.S. at 447, 94 S.Ct. at 2365.

We consider it necessary to point out that the record discloses a widespread search for the suspects Peak and Poindexter which evinced at least a negligent disregard by the Omaha police for the constitutional rights of not only petitioner but possibly other citizens as well.[12] Such a police search is at least reminiscent of the police conduct condemned in Lankford v. Gelston, *supra.* We believe that this is an appropriate case for the application of the exclusionary rule.

In summary, we hold that the existence of probable cause to support a search warrant may be judged only on the information submitted to the magistrate issuing the warrant, and we further hold that the evidence of probable cause submitted to the magistrate in this case was wholly insufficient, thereby rendering the search warrant under review invalid. Furthermore, finding that the petitioner has exhausted his state post-conviction remedies, we hold that the warrantless police entry into petitioner's house in search of Duane Peak or any explosives was without probable cause and in violation of the United States Constitution.

In concluding this lengthy opinion, we are mindful that a brutal crime was perpetrated in which the life of a police officer was ended without justification. It cannot be gainsaid that Judge Urbom recognized the seriousness of the offense and the general public outrage over the crime. Against this background, Judge Urbom exercised painstaking care in resolving the factual and constitutional issues in this case. Having done so, Judge Urbom conscientiously and courageously concluded and demonstrated in two soundly reasoned opinions that the petitioner had been deprived of a basic constitutional right.

We suspect that our affirmance of the grant of the writ will be regarded by some as an example of permissiveness and lack of concern for society by the judiciary. But no matter how heinous the crime, the fact of its commission

---

**12.** In dictum in United States v. Cecil, 457 F.2d 1178, 1180 (8th Cir. 1972), we disapproved of the manner in which the search of the NCCF headquarters was conducted by law enforcement officers earlier on Saturday, August 22, 1970.

alone is insufficient under our system of jurisprudence to establish the guilt of the accused. The safeguarding of fundamental constitutional rights is a tolerable price to pay for cherished standards of justice.

As Judge Urbom noted in his opinion, 388 F.Supp. 202:

> No one can doubt the important public interest involved in apprehending an accused murderer of a police officer, but I think respondent seriously mischaracterizes the interest involved in preventing invasions of privacy by the police. The privacy of one's home and the concommitant ability to decide whom it shall shelter and when is one of the most precious rights we possess as citizens. Entry into the home by police absent probable cause to so enter is precisely what the Fourth Amendment forbids. Apprehension of a dangerous criminal outweighs this interest in the privacy of one's home only if there is probable cause to believe that the criminal is in the home.

The judgment of the district court is affirmed. Unless the State of Nebraska retries petitioner within a reasonable time, to be fixed by the district court, after the filing of our mandate in that court, the writ shall issue.