**UNITED STATES of America, Appellee,**

v.

**Giorgio PENCO, Defendant-Appellant.**

**No. 198, Docket 78–1182.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 16, 1978.

Decided Sept. 6, 1979.

Gilbert Epstein, New York City, for appellant.

Robert B. Mazur, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty. and Howard W. Goldstein, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before FRIENDLY, TIMBERS and VAN GRAAFEILAND, Circuit Judges.

TIMBERS, Circuit Judge:

Appellant Giorgio Penco appeals from a judgment entered May 10, 1978 in the Southern District of New York, after a jury trial before Lee P. Gagliardi, *District Judge*, convicting him of conspiring to violate the federal narcotics laws (Count One) in violation of 21 U.S.C. § 846 (1976), and distributing cocaine and possessing it with intent to distribute (Count Two) in violation of 21 U.S.C. §§ 812 and 841 (1976).[1] The questions on appeal all relate to the district court's denial, after a hearing, of appellant's pre-trial motion to suppress 1.2 kilograms of cocaine seized without a warrant from the apartment of Leslie Duverglas (a co-defendant and co-conspirator) at the time of the latter's arrest on January 31, 1978. Specifically, the questions presented are (1) whether Penco has standing to assert violations of his constitutional rights with respect to the seizure of cocaine from Duverglas' apartment, and (2) if Penco has standing, whether the seizure of the cocaine was in violation of the Fourth Amendment. For the reasons below, we affirm.

I.

This case stems from the efforts of the federal Drug Enforcement Administration (DEA) to put Penco, Leslie Duverglas, Patrice Mespoulede and others out of the business in which the DEA believed they were engaged—the sale of multi-kilogram quantities of cocaine. Toward that end, the DEA employed as an informant one Dennis Solovay, who himself had been arrested on federal narcotics charges.

One of the individuals to whom Solovay had sold cocaine was Mespoulede, who shared an apartment at 210 Central Park South in Manhattan with Duverglas and the latter's girl friend, Amy Bonk. On October 25, 1977 Mespoulede introduced Solovay to Duverglas at the Studio 54 discotheque in Manhattan. Duverglas later confided to Solovay, according to the latter's testimony at trial, that Duverglas and Mespoulede were partners in a cocaine operation.

Duverglas and Solovay again met at Studio 54 on Saturday night, January 28, 1978. Duverglas told Solovay that he had for sale "some fantastic flake cocaine" and that he was trying to acquire some quaalude.[2] Solovay reported this conversation to Special Agent Hall of the DEA.

Two days later, on the afternoon of January 30, Solovay spoke by telephone with Duverglas by calling the latter's Central Park South apartment. Duverglas confirmed that he had cocaine for sale, quoted Solovay a price of $1,400 an ounce for 18 ounces, and said that his supplier could provide several kilograms. Solovay replied that he would have to check the proposed deal with his "people". On the evening of the same day Solovay went to Duverglas' Central Park South apartment. There Duverglas showed him an ounce of cocaine and gave him two small samples from the ounce. Solovay used one sample in the apartment and later turned the other sample over to the DEA for analysis.

The following day, January 31, Solovay again called Duverglas, told him that his people liked the sample and would purchase between two and three kilograms. While they were speaking, there arrived at the Duverglas apartment an individual later identified as Penco. Duverglas told Solovay over the phone that the individual who had just arrived was Duverglas' supplier who would provide the cocaine for sale to Solovay. In a series of phone conversations

---

1. Penco was sentenced to concurrent three year terms of imprisonment on each count, to be followed by a six year term of special parole upon his release from prison.

2. Quaalude is a brand name for methaqualone, a Schedule II controlled substance. 21 U.S.C. § 812 (1976).

the same day, Duverglas and Solovay discussed arrangements for a sale of three kilograms of cocaine to take place that evening. Later in the day, during a meeting at a midtown restaurant in Manhattan, they reduced the amount of the sale to one and one-half kilograms. They closed negotiations for the deal, but only after Duverglas had received a phone call from Mespoulede with whom Penco had spoken at the Duverglas apartment.

At 6 P.M. that evening Solovay phoned Duverglas at the latter's apartment, told him that he had the money and that he was ready to go through with the deal. Duverglas told Solovay to come to the apartment in an hour when he expected his "man" to be there with the cocaine. Solovay arrived at the apartment shortly after 7 P.M. Duverglas told him that his "man" had not yet arrived with the cocaine but that he would be there shortly. Solovay left the apartment after Duverglas told him to phone the apartment at quarter-hour intervals. Between Solovay's first and second calls, Penco arrived at the Duverglas apartment carrying what agents outside observed to be a "bulging" briefcase. He was accompanied by a small dog.[3]

When Solovay phoned the apartment shortly thereafter, Duverglas told him, "the package has arrived, the connection brought the package". He told Solovay to come to the apartment in 20 minutes. Solovay did.

In the meanwhile Mespoulede had cut the cocaine which Penco had brought to the apartment. He used inositol, a non-narcotic white powder frequently used to dilute narcotics. He then placed the mixture in a bag.

Upon Solovay's arrival, Duverglas showed him what he said was one and one-eighth kilograms of cocaine, rather than the one and one-half promised. Solovay expressed his annoyance, took a sample of the cocaine with him and left. He later phoned Duverglas to call off the purchase that evening, stating that his people were upset

with the many changes in the weight of the cocaine.

While Solovay and Duverglas were negotiating the purchase and sale of cocaine, another, more complex, drama was unfolding as the result of the surveillance of Solovay and the Duverglas apartment which had been maintained by a team of DEA agents throughout the day and early evening of January 31.

By 6 P.M. on January 31 the agents had learned from Solovay that more than a kilogram of cocaine would be delivered to Duverglas' apartment within the hour. Their surveillance thereupon focused upon the inside and outside of 210 Central Park South. They entered the apartment building and took up positions in three principal areas: the basement garage, the lobby, and the third floor stairwell. From these positions they were able to observe and corroborate Solovay's reports of his negotiations with Duverglas; they also were able to identify Penco as the supplier of the cocaine.

Three agents drove into the garage of the apartment building, from which they proceeded to the lobby. From there they gained entrance to the upper floors by stating to the doorman what they had said to the garage attendant: that they were searching for a fugitive who had visited someone on the eleventh floor. The agents took an elevator to that floor. They then walked back down to the third floor where Duverglas' apartment was located. Other agents remained in the garage and the lobby.

After turning out the lights at the third floor stairwell, the three agents in that position set up a surveillance post to monitor apartment 3A. They saw Solovay arrive and depart shortly after 7 P.M. before the cocaine had been delivered. Amy Bonk left the apartment shortly thereafter. Penco arrived at about 7:45 with his dog and the bulging briefcase. Bonk returned shortly after 8 P.M., followed by Solovay

---

3. Despite the dog's small size and unspecified lineage, he was soon to perform a significant role in the unfolding events—as dogs not infrequently do in the drama of life.

who stayed about ten minutes. After Solovay made his final call to Duverglas cancelling the cocaine deal, Penco left the apartment, accompanied by his dog, at 9:15 P.M. Two agents who had been waiting in the lobby also saw him leave. They followed him to the garage and placed him under arrest. He was carrying an empty briefcase.

The agents then used a ruse to gain access to the Duverglas apartment. They told the elevator operator that they had found Penco's dog wandering in the hallway. The elevator operator took the dog and the agents to apartment 3A. When the elevator operator knocked, Amy Bonk opened the door. An agent thereupon arrested Duverglas in a front hallway as he walked toward the door. Inside the apartment, the agents found Mespoulede in the bedroom. They also observed and seized 1.2 kilograms of cocaine, together with assorted narcotics paraphernalia.

Penco and Duverglas both were indicted, tried and convicted on the two counts of violating the federal narcotics laws stated above. From the judgment of conviction with respect to Penco, this appeal has been taken.[4]

## II.

We turn first to the question of whether Penco has standing to assert violations of *his* constitutional rights with respect to the seizure of cocaine from the apartment of *another*, i. e. from the apartment of Duverglas, a co-defendant and co-conspirator. The question again arises in the context of a situation where there is no automatic standing on the conspiracy count but there is on the possession count. *United States v. Mejias*, 552 F.2d 435, 443–45 (2 Cir.), *cert. denied sub nom. Padilla-Martinez v. United States*, 434 U.S. 847 (1977); *United States v. Galante*, 547 F.2d 733, 738–40 (2 Cir. 1976), *cert. denied*, 431 U.S. 969 (1977); *United States v. Miguel*, 340 F.2d 812 (2 Cir.), *cert. denied*, 382 U.S. 859 (1965). Moreover, as Penco concedes in his brief on appeal, he made no claim of actual standing.

■ It may be helpful to back up for a moment and consider the reasoning which led to the automatic standing rule. Prior to the decision of the Supreme Court in *Jones v. United States*, 362 U.S. 257 (1960), a defendant in a criminal case which involved possessory offenses was "pinioned" by a dilemma: to show the requisite proprietary interest in seized items to establish standing to seek their suppression, a defendant was "forced to allege facts the proof of which would tend, if indeed not be sufficient, to convict him." *Id.* at 262. To enable a defendant to escape that dilemma, the Court established the rule of automatic standing in instances where "possession both convicts and confers standing, eliminat[ing] any necessity for a preliminary showing of an interest in the premises searched or the property seized, which ordinarily is required when standing is challenged." *Id.* at 263.

Aside from dealing with the self-incrimination problem, it was believed that the automatic standing rule eliminated the possibility that the government would "have the advantage of contradictory positions as a basis for conviction." *Id.* Thus, despite the Supreme Court's extension of the exclu-

---

4. Mespoulede was named in the instant indictment as an unindicted co-conspirator. He also was charged with possession of cocaine and conspiracy to distribute it in a separate two count indictment that named Duverglas and Penco as unindicted co-conspirators. At his first trial, Mespoulede was acquitted on the possession count, and Judge Motley declared a mistrial on the conspiracy count when the jury was unable to reach a verdict. On retrial, Mespoulede was convicted on the conspiracy count, but on appeal this conviction was set aside on the ground that acquittal on the pos-

session charge collaterally estopped the government from attempting to prove his possession of the cocaine on January 31, 1978. *United States v. Mespoulede*, 597 F.2d 329 (2 Cir. 1979).

Four days after the argument of the instant appeal, Duverglas was sentenced in the instant case to concurrent three year terms of imprisonment on Counts I and II, to be suspended after six months of imprisonment, at which time he was ordered to be placed on probation for a period of thirty months. He also was sentenced to a three year special parole term.

sionary rule to bar the admission at trial of statements made to establish standing, *Simmons v. United States*, 390 U.S. 377, 391–94 (1968), the rule of automatic standing has not been abandoned by our Court. *E. g., United States v. Riquelmy*, 572 F.2d 947, 950–51 (2 Cir. 1978); *United States v. Galante, supra*, 547 F.2d at 737.[5]

The indictment in the instant case charged two counts. Although appellant argues to the contrary, clearly the conspiracy count does not bring into play the automatic standing rule. *United States v. Oates*, 560 F.2d 45, 56 n.7 (2 Cir. 1977); *United States v. Galante, supra*, 547 F.2d at 737–38.[6] The reason for this is that a conspiracy to violate the narcotics laws may be established without any showing of possession. Possession is "neither a necessary . . . nor a sufficient" element of the conspiracy charge and therefore the test for automatic standing, as we recently have stated it, is not satisfied. *United States v. Oates, supra*, 560 F.2d at 55–56 & n.6.[7] On the other hand, we held in *Oates* that a charge of possession with intent to distribute does bring into play the automatic standing rule since possession is a necessary element of the offense. *Id.* at 56.[8]

This does not end our inquiry. There remains in the instant case the question whether the possession element of the count against Penco which charged posses-

sion with intent to distribute is too remote in time from the search of the Duverglas apartment to warrant application of the automatic standing rule in light of *Brown v. United States*, 411 U.S. 223 (1973). The Supreme Court restricted the *Jones* rule in *Brown*, which was a transportation of stolen goods case. The Court rejected the standing claim of two co-conspirators who sought to suppress evidence obtained during a search of a store owned by a third co-conspirator (Knuckles). The two had been photographed taking merchandise from their employer's warehouse, were followed a short distance, and were arrested. Later, they confessed to having conspired with Knuckles to steal other merchandise from their employer and to having "sold" it to Knuckles. The evidence seized during the search of Knuckles' store was stolen during the earlier heists, all of the material having been turned over to Knuckles not less than two months before the challenged search. The indictment was "carefully limited", 411 U.S. at 229, to exclude from its charges of conspiracy and transportation the time of the search. The Court emphasized the two month lapse of time in distinguishing the case from *Jones*. *Id.* at 229.

In our view, the possession count in the instant case is distinguishable from *Brown* in at least three respects of sufficient importance to warrant our according automatic standing here on that count.

---

5. The Supreme Court left the question open in *Brown v. United States*, 411 U.S. 223, 228 (1973). Aside from the cases in our Court, the Ninth and Fifth Circuits also support the continued vitality of the automatic standing rule. *United States v. Jamerson*, 549 F.2d 1263, 1269 (9 Cir. 1977); *United States v. Holmes*, 521 F.2d 859, 868 (5 Cir. 1975), aff'd, 537 F.2d 227 (5 Cir. 1976) (en banc); *United States v. Boston*, 510 F.2d 35, 37 (9 Cir. 1974), *cert. denied*, 421 U.S. 990 (1975). *Contra, United States v. Hunter*, 550 F.2d 1066, 1072 (6 Cir. 1977); *United States v. Delguyd*, 542 F.2d 346, 350 (6 Cir. 1976), and cases there cited. The Tenth and Seventh Circuits appear to have left the question open. *United States v. Smith*, 527 F.2d 692, 695–96 (10 Cir. 1975); *United States v. Calhoun*, 510 F.2d 861, 866–67 n.4 (7 Cir.), *cert. denied*, 421 U.S. 950 (1975).

On automatic standing generally, *see* Knox, *Some Thoughts on the Scope of the Fourth Amendment and Standing to Challenge Searches and Seizures*, 40 Mo.L.Rev. 1, 30–52 (1975); Gutterman, *"A Person Aggrieved": Standing to Suppress Illegally Seized Evidence in Transition*, 23 Emory L.J. 111, 120–27 (1974).

6. *Accord, United States v. Archbold-Newball*, 554 F.2d 665 (5 Cir.), *cert. denied*, 434 U.S. 1000 (1977); *United States v. Prueitt*, 540 F.2d 995, 1004 (9 Cir. 1976), *cert. denied sub nom. Temple v. United States*, 429 U.S. 1063 (1977); *Duncan v. St. Louis-S. F. Ry.*, 480 F.2d 79 (9 Cir.), *cert. denied*, 414 U.S. 859 (1973).

7. *See also United States v. Kahan*, 415 U.S. 239, 242 (1974) (evidence must be such that it would "necessarily be incriminating" if introduced).

8. *See also United States v. Riquelmy, supra*, 572 F.2d at 951. *Accord, United States v. Fields*, 458 F.2d 1194 (3 Cir. 1972), *cert. denied*, 412 U.S. 927 (1973).

First, *Brown* did not involve a possessory offense. Here, possession with intent to distribute is charged.

Second, the "gap" in *Brown* was substantial—two months. Here, by contrast, Penco is charged with an offense of possession which continued up to the moment of the seizure at the Duverglas apartment. This is so by virtue of the aiding and abetting charge in the indictment. In any event, the arrest and the raid at the apartment were two facets of the same pincers movement whose purpose was to seize the contraband. Possession of the narcotics here was the basis for the immediate violation—unlike in *Brown,* where the violation occurred two months before the seizure. For practical purposes, the instant case is the same as where two individuals are arrested in each other's company, on a charge of possession with intent to distribute, but only one has physical possession of the narcotics at the time of the arrest. The other still has automatic standing to raise asserted violations of his Fourth Amendment rights. *United States v. Riquelmy, supra,* 572 F.2d at 951; *United States v. Oates, supra,* 560 F.2d at 55–56.[9]

Third, the *Brown* indictment specifically limited the charges to the time preceding the search.[10] The evil of the prosecution at once asserting and denying possession by a defendant was not present in *Brown.* The same cannot be said here. The possession with which Penco is charged is not distinguishable from the possession at the time of the seizure.[11]

We return to the dilemma stated at the outset of this section of our opinion: how to handle, from the standpoint of trial or ap-pellate management, the situation where there is automatic standing on one or more counts (here, the possession count) but not on other counts (here, the conspiracy count). We think that the wise and comprehending district judge here provided the sensible solution. Although Judge Gagliardi ultimately held that Penco lacked automatic standing on both counts, he nevertheless held a full hearing and allowed Penco to participate at the hearing, treating him no differently than if he had standing. We do likewise.[12] While we would have reached a different conclusion than did Judge Gagliardi with respect to Penco's automatic standing on the possession count, this matters not in view of our agreement with Judge Gagliardi that there is no merit to the asserted violations of Penco's Fourth Amendment rights arising from the seizure of cocaine from the Duverlgas apartment.

## III.

This brings us to the merits of Penco's constitutional claims.

He first contends that his Fourth Amendment rights were violated by the presence of DEA agents in the stairwell, garage and other public areas of the Duverglas apartment building, since their presence infringed a reasonable expectation of privacy. We disagree.

■ The law of this Circuit consistently has rejected appellant's contention. The Fourth Amendment protection accorded to an apartment dweller's home does not extend to the lobby of his apartment building, *United States v. Miguel, supra,* or the area just inside a hall door that was meant to

---

**9.** *Oates* also involved a charge of aiding and abetting possession. *See also United States v. Boston, supra,* 510 F.2d at 37.

**10.** *But see United States v. Tortorello,* 533 F.2d 809, 814 n.3 (2 Cir.), *cert. denied,* 429 U.S. 894 (1976).

**11.** This is thus not a case where "the period of . . . possession clearly related to a time prior to his sale of the substance . . . ." *United States v. Palazzo,* 488 F.2d 942, 947 (5 Cir. 1974) (standing rejected for drug seller who had sold quantities of drugs to defendants from whom they were seized at airport later that day).

**12.** We prefer this approach to that followed in *United States v. Mejias, supra,* 552 F.2d at 445 (Court declined to rule on alleged error in denying suppression motion addressed to possession count in view of concurrent sentences imposed on conspiracy and possession counts). Difficulties with the *Mejias* approach were suggested by Judge Meskill in *United States v. Galante, supra,* 547 F.2d at 740 n.13.

lock but did not, *United States v. Conti*, 361 F.2d 153 (2 Cir. 1966), *vacated on other grounds*, 390 U.S. 204 (1968), or the hallway just outside his apartment door, *United States v. Wilkes*, 451 F.2d 938, 941 n.6 (2 Cir. 1971). The argument that the privacy expectations analysis of *Katz v. United States*, 389 U.S. 347 (1967), somehow undercut the reasoning of *Miguel* and *Conti* was expressly considered and rejected by our Court in *United States v. Llanes*, 398 F.2d 880 (2 Cir. 1968), *cert. denied*, 393 U.S. 1032 (1969).

 It follows that there was no violation of appellant's constitutional rights by reason of the presence of the DEA agents in the hallway outside the Duverglas apartment, in the building stairwell, or in its garage, so long as they entered peaceably. They did.

■ Penco's second constitutional claim, predicated on our decision in *United States v. Reed*, 572 F.2d 412 (2 Cir.), *cert. denied sub nom. Goldsmith v. United States*, 439 U.S. 913 (1978), is that the warrantless arrest of Duverglas in his apartment, *absent exigent circumstances*, violated his Fourth Amendment rights, even though based on probable cause, thus requiring suppression of the cocaine against Penco as the fruit of an illegal arrest.

This claim is foreclosed by our decision—rendered subsequent to the arguments in the instant case—in *United States v. Corcione*, 592 F.2d 111 (2 Cir.), *cert. denied*, 440 U.S. 975 (1979), holding that "the *Reed* decision is not retroactive." *Id.* at 118. The arrest in the instant case took place several months before *Reed*. The exigent circumstances rule of *Reed* therefore is not applicable in the instant case.

Applying the pre-*Reed* standard, based on the facts set forth under Section I of this opinion, there was abundant probable cause for the arrest of Duverglas, since the DEA agents were as certain as human observation permits that a substantial amount of cocaine was in the Duverglas apartment at the time of the arrest. *E. g., United States v. Reed, supra*, 572 F.2d at 424; *United*

*States v. Thompson*, 356 F.2d 216, 222 (2 Cir. 1965), *cert. denied*, 384 U.S. 964 (1966).

We have considered carefully all of Penco's claims of error and we find them to be without merit.

Affirmed.