UNITED STATES of America, Plaintiff-Appellee,

v.

Oscar ARBOLEDA, Defendant-Appellant.

No. 528, Docket 79–1278.

United States Court of Appeals, Second Circuit.

Argued Dec. 11, 1979.

Decided June 9, 1980.

Rehearing Denied Oct. 8, 1980.

Harvey J. Golubock, Asst. U. S. Atty., Eastern District of N. Y., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., Eastern Dist. of N. Y., Miles M. Tepper, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for plaintiff-appellee.

Ira Leitel, New York City (Carol Mellor, New York City, of counsel), for defendant-appellant.

Before FRIENDLY, MULLIGAN and OAKES, Circuit Judges.

FRIENDLY, Circuit Judge: *

This appeal is from a judgment of the District Court for the Eastern District of

* This appeal was argued before Judges Mulligan, Oakes and Gurfein on December 11, 1979. Although before his death on December 16, 1979, Judge Gurfein had voted, along with Judge Mulligan, to affirm the conviction, their grounds were not identical. Chief Judge Kaufman then designated the writer to sit with Judges Mulligan and Oakes and decide the ap-

New York, Thomas C. Platt, Jr., *Judge*, convicting defendant, after a jury trial, under an indictment charging one count of criminal possession of 94 grams of a controlled substance with intent to distribute, in violation of 21 U.S.C. § 841. The sole ground urged for reversal is the court's refusal to suppress the evidence seized and the statements made by the defendant at the time of his arrest in his apartment at 51–55 Van Kleck Avenue, Elmhurst, Queens, New York.

The circumstances surrounding the arrest of Arboleda and the seizure of the highly damaging evidence were elicited at a pretrial suppression hearing. Three witnesses testified: two of the police officers who were present on the scene, and the defendant. The trial judge said that he found "much, if not all, of the defendant's testimony to be incredible and credits fully the testimony of Detective Bisbee."

The facts developed at the hearing were as follows: On the evening of April 9, 1979, New York City Detective Bisbee, assigned to the Drug Enforcement Task Force, went to the Van Kleck Avenue apartment, along with Officer Flores and Group Supervisor and Investigator Gross of the New York City Police Department, for the purpose of apprehending defendant's brother, Gilberto Arboleda, who was wanted in connection with narcotics-related homicides, and also to interview the defendant. Officers Gross and Flores stationed themselves outside the front door of Apartment 3 H, listened in order to ascertain whether anyone was inside, and heard some movement and the noise of a TV. Bisbee arranged that at a set time the officers should knock on the door and announce themselves as police. He ascended to an apartment on an upper floor and with the occupant's consent went through it to a window that gave access to the fire escape. He descended this to the floor on which defendant's apartment was located,[1] climbed over the fence of the fire escape to a two-foot ledge and made his way along it, with the purpose of preventing "the possible escape of Gilberto Arboleda whom we believed may have been in the apartment." Bisbee testified that he glanced into the windows of the apartment as he proceeded, but that he could not see into it because the blinds were drawn. The kitchen window blinds were "maybe halfway up"; Bisbee's glance only permitted him to make out that the room was a kitchen. The trial court found that at the prearranged time of the signal Bisbee heard a banging noise.[2] The court described what then happened as follows:

> The defendant came to the kitchen window of his apartment. The window opened and the defendant looked out, tossed an aluminum foil package out the window towards the underneath part of the fire escape, looked around and quickly slammed the window and began locking it. Detective Bisbee ran over, grabbed the package from the fire escape, looked inside and saw a plastic bag filled with white powder which in his opinion appeared to be cocaine. Thereupon he banged on the window, held up his badge and the package and said "Police, open the window." (Tr. 9).

> The defendant (who now claims to speak no English) replied by holding up a single finger and saying "Wait one minute" and "With that he ran away from the window." (Tr. 11) and then made a left hand turn (Tr. 12).

> Detective Bisbee then smashed the window, opened it, jumped through the opened window and ran in the direction the defendant had run, and saw that the bathroom door was closed. He heard a toilet being flushed and he kicked open the closed bathroom door. Inside Detective Bisbee found Oscar Arboleda and the

---

peal, pursuant to Rules of the United States Court of Appeals for the Second Circuit, § 0.14(b). In addition to studying the record and briefs the writer has listened to a tape recording of the oral argument.

1. Despite the designation 3 H the clear testimony of Detective Bisbee was that the apartment was on the second floor.

2. Officer Flores denied that he or Officer Gross had yet banged.

defendant then took another package of clear plastic containing white power, molded into a pair of dungarees, folded it and dropped it on the ground. (Tr. 13). Detective Bisbee advised him he was under arrest whereupon the defendant began struggling with him and continued to struggle with him all the way into the living room. Detective Bisbee finally managed to get one handcuff on the defendant, pulled him over to the door and opened it to admit the other officers who were waiting outside. The officers went through the apartment checking each room, looking for Arboleda's brother or anyone else who might be there. During this investigation, Detective Bisbee recovered the second package of cocaine from the bathroom. Thereafter, in Detective Bisbee's presence, Officer Flores warned the defendant of his rights, in Spanish. During the course of the aforedescribed events, Detective Bisbee heard New York City Police Officers who had apparently been called to the scene by other people "Yelling outside". Detective Bisbee went back into the kitchen and from the kitchen window informed the police officers outside that there were police officers already in the premises. It was at this time that he observed a Hamilton Scale on the sink, a package of zip lock bags and four stringers hanging at the end of the sink.

## I.

In the district court Arboleda, then represented by different counsel, focused his attack on Bisbee's breaking the window, entering the apartment and arresting Arboleda without a warrant, allegedly in violation of *United States v. Reed*, 572 F.2d 412 (2 Cir.), *cert. denied*, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978), now reinforced by *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Arboleda testified at the suppression hearing that he did not lean out the window or toss a package along the ledge, as the district court permissibly found, but that Bisbee simply broke in through the window. On appeal counsel focused not on Bisbee's entry through the window or arrest of Arboleda without a warrant, but rather on his entry onto the ledge. Counsel conceded that if Bisbee's seizure of the plastic bag, reasonably believed to contain cocaine, was lawful, which he stoutly denied, the breaking of the window and the subsequent entry, search and arrest were unobjectionable. These actions clearly came within the "exigent circumstances" exception recognized in *Reed, id.* at 418, 424.[3] He conceded also that if the officers were armed with an arrest warrant for Gilberto Arboleda, his appeal should be dismissed, presumably because on that assumption Bisbee would have been justified in placing himself on the ledge to prevent Gilberto's escape,[4] see *United States v. Anderson*, 552 F.2d 1296, 1300 (8 Cir. 1977), and the seizure of the first package would be valid under the plain view doctrine, *Coolidge v. New Hampshire*, 403 U.S. 443, 451 *et seq.*, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), since the circumstances were exigent and the discovery inadvertent. His argument is that there was no such warrant and that without one, while Bisbee may have had a right to station himself on the fire escape, a "public area" of the building within our decisions in *United States v. Llanes*, 398 F.2d 880 (1968), *cert. denied*, 393 U.S. 1032, 89 S.Ct. 647, 21 L.Ed.2d 576 (1969), and

---

**3.** No contention has been made that if the entry and arrest were valid, the recovery of the second package of cocaine and the narcotics paraphernalia without obtaining a search warrant violated *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

**4.** Counsel did argue that Bisbee would have been better advised to remain on the fire escape since placing himself on the ledge risked a struggle in which he might have fallen to the ground. Bisbee could have thought it necessary to take this risk since otherwise Gilberto might have jumped to the street. In any event Bisbee's choice of more dangerous tactics would violate no constitutional right of appellant if he was acting to prevent Gilberto's escaping from what would have been a valid arrest.

*United States v. Penco,* 612 F.2d 19, (2 Cir. 1979), he committed an unlawful intrusion when he left the fire escape for the ledge and that any fruits of this action are thus suppressible. Cf. *Coolidge v. New Hampshire, supra,* 403 U.S. at 465–66, 91 S.Ct. at 2037–2038.

■ The argument encounters the serious difficulty that the record is barren of any evidence that none of the officers had an arrest warrant. "It is well established that the burden of production and persuasion generally rest upon the movant in a suppression hearing." *United States v. De La Fuente,* 548 F.2d 528, 533 (5 Cir.), *cert. denied,* 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249, 434 U.S. 954, 98 S.Ct. 479, 54 L.Ed.2d 312 (1977). See *United States v. Morin,* 378 F.2d 472, 475 (2 Cir. 1967); cf. *United States v. Masterson,* 383 F.2d 610, 614 (2 Cir. 1967), *cert. denied,* 390 U.S. 954, 88 S.Ct. 1048, 19 L.Ed.2d 1147 (1968) (F.R. Cr.P. 41(e)). The movant can shift the burden of persuasion to the Government and require it to justify its search, however, when the search was conducted without a warrant. *United States v. Mapp,* 476 F.2d 67, 76 (2 Cir. 1973). Although there was no search warrant for Arboleda's apartment, the police officers were going to the apartment to arrest Gilberto, and if they had an arrest warrant for Gilberto this would have the same legal effect as a search warrant in justifying entry into Arboleda's home to effect the arrest. See e. g., *United States v. Cravero,* 545 F.2d 406, 421 (5 Cir. 1976) (on petition for rehearing), *cert. denied,* 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977); *United States v. McKinney,* 379 F.2d 259, 263 (6 Cir. 1967) (McCree, J.).[5]

Arboleda cannot, therefore, rely on the lack of a search warrant to shift the burden to the Government.

■ The movant must at least question the existence of a warrant before the Government is compelled to produce it. In *United States v. De La Fuente, supra,* 548 F.2d at 533, the court stated that:

[I]n some well-defined situations the ultimate burden of persuasion may shift to the government *upon an initial showing of certain facts by the defendant.* For example, if a defendant produces evidence that he was arrested or subjected to a search without a warrant, the burden shifts to the government to justify the warrantless arrest or search. (emphasis supplied).

See also *United States v. Warren,* 578 F.2d 1058, 1067 & n. 6 (5 Cir. 1978) (en banc) ("it is incumbent upon the party moving to suppress evidence to demonstrate lack of authority for its acquisition"). Cf. *United States v. Diezel,* 608 F.2d 204, 207 (5 Cir. 1979) (voluntariness of confession). Arboleda did not make the showing necessary to call upon the Government to adduce evidence of a warrant for Gilberto's arrest which, as he concedes, would justify Bisbee's presence on the ledge and the subsequent arrest of Arboleda and search of the apartment.

The rule requiring a movant at least to make an initial demonstration of lack of authority is sound both in logic and in fairness. As noted, the general rule is that the burden is on the movant, and so the movant must take some action, such as questioning the existence of a warrant, before the bur-

---

**5.** This Circuit appears not to have squarely held that an arrest warrant permits entry into the residence of a third person to effect the arrest. The issue was presented in *United States v. Hammond,* 585 F.2d 26, 28 (2 Cir. 1978), but the court did not reach it because counsel conceded the point. Judge Meskill noted that counsel's concession appeared to be "in accord with hints by the Supreme Court that, at least in some circumstances, an arrest warrant may be all that is required for law enforcement officers to enter a private residence, or to search that residence, for purposes of arresting

the subject of the warrant." *Id.* at n. 1 (citing numerous cases). A more recent "hint" along the same lines was provided by Justice Powell in *Dalia v. United States,* 441 U.S. 238, 257–58, 99 S.Ct. 1682, 1693–1694, 60 L.Ed.2d 177 (1979) (citing *Cravero, supra*). In any event, counsel, whose objection on appeal is Bisbee's entry onto the ledge, conceded that the appeal should be dismissed if there was an arrest warrant for Gilberto. The only reason for this concession would be recognition that such a warrant would authorize the entry onto the ledge.

den shifts to the Government. Further, there is a presumption of regularity of official action which the movant must do something to unseat. *See United States v. Mangan,* 575 F.2d 32, 41 (2 Cir.), *cert. denied,* 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1978); *United States v. Warrington,* 17 F.R.D. 25, 29 (N.D.Cal.1955). It would have been simple for defense counsel to have asked Bisbee or Flores, who also testified at the suppression hearing, whether or not they had an arrest warrant for Gilberto. It is true that it would have been equally simple for the Government to have asked, but there was no occasion for its doing so since in the district court defendant made no point of the illegality of the projected entry through the door or the contemplated arrest of Gilberto. Arboleda did nothing below to suggest to the Government that the existence of a warrant for the arrest of Gilberto would be called into question, even though Arboleda knew that the officers explained their coming to the apartment and the stationing of Bisbee on the ledge on the basis of the effort to arrest Gilberto. "Appellant should not profit from his own failure to develop a proper record." *Mangan, supra,* 575 F.2d at 41.

The dissent suggests that we should relieve the appellant of the consequences of this failure because it is somehow "unfair" to expect him to question the existence of a warrant for the arrest of a third party. This ignores the facts of the case. The role of the contemplated arrest of Gilberto in this scenario did not suddenly emerge out of the blue. Arboleda knew that Bisbee was positioned on the ledge pursuant to the endeavor to arrest Gilberto, and it was open to him below to question the officers about this effort by, for example, asking if they had a warrant and inquiring into the basis for their belief that Gilberto was in the apartment. The paucity of record evidence on these points is not due to defendant's inability to anticipate them, but rather is caused by the fact that pitting his own version of the facts against that of the officers as to what occurred on the ledge, he did not question them in any way. If, as the dissent suggests, there is anything "Kafkaesque" about this case it is the complete "metamorphosis" in appellant's legal argument between trial and appeal—a change so great as to make it questionable whether Arboleda should even be heard on the contention with respect to the illegality of Bisbee's presence on the ledge that is now mainly pressed.[6]

**6.** What has just been said largely disposes of another argument made in the dissent, namely, that even an arrest warrant would not justify an entry unless the officers reasonably believed that Gilberto was within the apartment. Since Arboleda did not question the existence of a warrant, there was no occasion for the Government to develop the justification for its issuance or execution. Moreover, there was uncontradicted evidence that the officers in fact believed that Gilberto was within the apartment and considerable evidence that the belief was reasonable. Bisbee testified that the officers were led to the apartment by information gained while making other arrests, and that they knew Gilberto stayed with his brother "in the area of a month at a time or, possibly, months at a time." The officers verified their belief by checking with the building superintendent prior to going to apartment 3 H. The superintendent told them that *two* Colombians lived in the apartment *and that they were in the apartment at that time.* The lack of findings of reasonable belief that Gilberto was in the apartment, as in the case of the warrant itself, is due to the fact that the issue was not raised in the district court. Beyond all this,

counsel for Arboleda conceded at argument that if there was an arrest warrant, this appeal should be dismissed.

Again, apart from the concession, the dissent's further argument, fn. 3, that the officers were required to announce their presence and purpose prior to entering the *ledge* as opposed to the apartment is unpersuasive, even assuming the ledge was a protected area. See 2 LaFave, Search and Seizure 128 (1978) ("Historically, the notice requirement has been applied only to dwellings and other buildings within the curtilage . . . ."). The rule proposed in the dissent would require officers entering the yard of a home on their way to making an entry to shout their presence and purpose from the gate rather than after walking up to the door. *United States v. Fluker,* 543 F.2d 709, 716 (9 Cir. 1976), relied on by the dissent, is hardly in point. The officers there entered what the court considered part of a dwelling area by breaking down the door. Here there was no entry into a dwelling or comparable area but simply onto an exposed ledge which, while obviously part of the building, was not part of the apartment.

## II.

■ While this is a sufficient basis for affirmance, there is another. In *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Court said that "capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Id.* at 143, 99 S.Ct. at 430. See also *Katz v. United States*, 389 U.S. 347, 351, 361, 88 S.Ct. 507, 511, 516, 19 L.Ed.2d 576 (Harlan, J., concurring) (1967). Clearly Arboleda had such an expectation with respect to objects within his apartment but Bisbee's impermissible peeping-Tom activity produced nothing that led to the subsequent arrest and seizures. In contrast Arboleda had no legitimate expectation of privacy with respect to an object which he threw outside the apartment with the objective of getting,rid of it before it could be seized by the officers whose presence at the door he had apparently detected.

The district judge stated that Bisbee grabbed the package "from the fire escape." The fire escape was a common area where Bisbee could lawfully have been whether or not there was an arrest warrant. If Arboleda tossed the contraband onto it, he can claim no violation of his rights. Although Arboleda may have intended to retrieve the package later, by placing it in an unprotected area he had abandoned it for Fourth Amendment purposes. See *United States v. Lewis*, 227 F.Supp. 433 (S.D.N.Y.1964). Arboleda's action was precipitated by the perfectly legal knock of the officers at the door, and not by anything which Bisbee did, authorized or not.

Bisbee's testimony, however, suggests that the package fell short of the area where the fire escape hangs over the ledge and came to rest on the ledge itself. This makes no difference, since Arboleda had no legitimate expectation of privacy in the ledge.

*Rakas* provides considerable guidance on assessing whether there exists a legitimate expectation of privacy in any particular case. The Court noted that one may have a legitimate expectation of privacy "by virtue of [the] right to exclude." 439 U.S. at 143–44 n. 12, 99 S.Ct. at 430. There is no evidence that Arboleda exercised any exclusive control over the ledge, which ran along the front of the building and was accessible to other tenants from their windows and the fire escape.[7] Another relevant factor in considering what constituted a legitimate expectation of privacy is "the way a person has used a location." 439 U.S. at 153, 99 S.Ct. at 435 (Powell, J., concurring); 439 U.S. at 141, 149, 99 S.Ct. at 429, 433. Here there was no indication that Arboleda had ever used the ledge in a private manner or as a part of his home. A third factor is whether the defendant "took normal precautions to maintain his privacy." 439 U.S. at 152, 99 S.Ct. at 435 (Powell, J., concurring). Again, there is no evidence that Arboleda took any such precaution with respect to the ledge; indeed, the record demonstrates that the exigent circumstances in which Arboleda found himself when the officers knocked left no time for precautions.

It is difficult to imagine a legitimate expectation of privacy in an open area running along the front of the second floor of a building over a street. Bisbee was apparently observed on the ledge by someone who called the police to report a burglary; later Bisbee spoke through the kitchen window over the ledge to police on the street below. Cf. *United States v. Santana*, 427 U.S. 38, 42, 96 S.Ct. 2406, 2409, 49 L.Ed.2d

---

7. The dissent asserts that there is no record evidence that other tenants could gain access to the ledge from their windows, but Bisbee testified that the ledge "runs right along the whole width of Apartment 3 H and I believe it goes further than that, to the next apartment." Bisbee drew a sketch at the suppression hearing which indicated the ledge extending beyond apartment 3 H. In any event, it is clear that there was access from the fire escape and, even though the ledge may not have been used as a passageway, this freedom of access negates any contention that Arboleda exercised exclusive control over the area.

300 (1976). Although Arboleda complains in his reply brief that it is "quite conceivable" that there may have been obstructions to observation from the street, such speculation hardly suffices to discharge his burden of establishing a legitimate expectation of privacy. See *Rakas, supra*, 439 U.S. at 130–31 n. 1, 99 S.Ct. at 424.

■ Arboleda likewise is not helped by invocation of the hoary concept of "curtilage". Terming a particular area curtilage expresses a conclusion; it does not advance Fourth Amendment analysis. The relevant question is the one surveyed above, whether the defendant has a legitimate expectation of privacy in the area. See *Wattenberg v. United States*, 388 F.2d 853, 858 (9 Cir. 1968). It seems decidedly questionable whether, under the *Rakas* analysis, a homeowner could insist upon a search warrant if he hurled a package of cocaine onto his front lawn where it could be plainly seen by anyone. In its recent decision in *Payton v. New York, supra*, 48 L.W. at 4380, the Supreme Court identified the line at which the requirement for an arrest warrant takes hold as "the entrance to the house" and the "threshold". See also *United States v. Santana, supra*, 427 U.S. at 42, 96 S.Ct. at 2409 (vestibule behind open door is public place). In any event, it is doubtful that the curtilage concept has much applicability to multifamily dwellings such as the one involved here. As the Court stated in *Commonwealth v. Thomas*, 358 Mass. 771, 267 N.E.2d 489, 491 (1971):

> In a modern urban multifamily apartment house, the area within the "curtilage" is necessarily much more limited than in the case of a rural dwelling subject to one owner's control. . . . In such an apartment house, a tenant's "dwelling" cannot reasonably be said to extend beyond his own apartment and perhaps any separate areas subject to his exclusive control.

See also *United States v. Agapito*, 620 F.2d 324, 331 and n. 9 (2 Cir. 1980).

Finally, any distinction between the ledge and the fire escape for Fourth Amendment purposes would be irrational. The fire escape projects over the ledge and runs along it, a small space above. As noted, it is a common area of the building, and thus no particular tenant can claim Fourth Amendment protection in it. Arboleda was not trying to hide the package on the portion of the ledge immediately adjacent to his apartment; Bisbee testified that Arboleda "directed" the package toward the fire escape but that it "hit the bar from the fire escape and rested there on the ledge." It is difficult to see why, under these circumstances, the ledge, which is readily observable from the fire escape and even runs under it in areas, should have a constitutionally different status than the fire escape itself.

Since the seizure of the package of cocaine was lawful both for the reason stated in Part I and for that stated in Part II of this opinion, the judgment of conviction is affirmed.

OAKES, Circuit Judge (dissenting):

The majority opinion holds first that a suppression movant must raise the issue whether officers who arrested him in his home had a warrant for a third person who was not found in the home. Apparently unsatisfied with a record that could have been cured to the majority's satisfaction by the asking of one simple question of Detective Bisbee,[1] the majority then goes on to hold, alternatively or cumulatively, that Arboleda "had no legitimate expectation of privacy with respect to an object which he threw outside the apartment with the intention of getting rid of it." Because I disagree with each of these conclusions, I must dissent.

The majority's first argument, condemning appellant because he failed to ask whether the officers had an arrest warrant for Gilberto Arboleda, constitutes a novel and unjustifiable procedural ruling. It ap-

1. The question would be "Do you claim you were on the ledge by virtue of any warrant to arrest or search?"

parently contains an implied substantive holding that is also unprecedented. It is conceded that, in the district court, appellant "focused his attack on Bisbee's breaking the window, entering the apartment and arresting Arboleda *without a warrant.*" Majority op. at 988 (emphasis added). The record below and the briefs on appeal make it equally clear that the Government and the district court consistently viewed this as a case involving a warrantless (but justifiable) entry and arrest. The district court's order denying suppression, for example, discussed two questions almost exclusively: (1) the propriety of Bisbee's "intrusion" onto the ledge where the initial plain view took place, under the warrantless entry case of *United States v. Anderson,* 552 F.2d 1296 (8th Cir. 1977) (see note 6 *infra*), and (2) the propriety of the subsequent warrantless entry through the window, on grounds of exigent circumstances.

In sum, the procedural holding of this case appears to be that a defendant in a suppression hearing, even after establishing clearly that he was arrested in his home and that there was no arrest warrant for him or search warrant for the premises, has a further burden of asking whether the arresting officers had an arrest warrant for any third party. On appeal, even if the district court and *both* parties have treated the case as one involving *no* warrants, the majority is apparently willing to affirm an otherwise illegal conviction because this question was not asked. This seems to me almost Kafkaesque. This rule would be less unfair if it were in line with general principles of burden of proof in suppression motions, but it is not.

It may be true as a general rule that the moving party in a suppression hearing has the burden of production and persuasion, as the case so relied upon by the majority points out. *United States v. De La Fuente,* 548 F.2d 528, 533 (5th Cir.), *cert. denied,* 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249, 434 U.S. 954, 98 S.Ct. 479, 54 L.Ed.2d 312 (1977). But when a defendant has produced sufficient evidence that he was arrested or subjected to a search without a warrant, the federal rule is that the burden shifts to the government to justify the warrantless arrest or search. *Id.; Manuel v. United States,* 355 F.2d 344 (5th Cir. 1966). Here appellant did produce such evidence and one would have thought that the burden then shifted to the government. Yet the court holds him to an additional burden—to ask whether the police were on *his* premises with a warrant for his *brother's* arrest. This is a burden that no case cited by the majority requires.

The burden-shifting in suppression hearings is clearly premised on a recognition of what it is fair to expect each party to prove. As Professor LaFave has stated:

if the search has been conducted incident to a warrant of arrest or search, and the defendant claims that the warrant was issued on less than probable cause, he has the burden of proving this allegation. This position may be based in part upon the "presumptions of regularity which attend the action" of the judicial officer issuing the warrant, but is better explained on the basis that it is in no way unfair to place the burden on the defendant when the government has already set forth in the complaint or affidavit the grounds upon which it rests the legality of its action. But, when the police have acted without a warrant, "it would be impossible for a defendant to prove a lack of probable cause in the abstract. The defendant cannot be expected to prove a lack of some item until he knows on what the government bases its claim of existence." Thus, the federal courts have placed the burden on the government in such cases.

LaFave, *Search and Seizure: "The Course of True Law . . . Has Not . . . Run Smooth,"* 1966 U.Ill.L.F. 255, 347–48 (citations omitted). It seems only fair to treat a third-party warrant as one of the many possible defenses that the Government can raise once the defendant has made his normal prima facie showing of an arrest without a warrant for *him* or an entry without a warrant to search *his* premises. Why must the defendant, at his peril, anticipate such a justification? To be sure,

under the majority's rule, the defendant need only "suggest," not "prove" the absence of an arrest warrant for someone else. But it is fundamentally unfair to require either action.

The unfairness is made worse here because of the implied Fourth Amendment *substantive* holding in the majority opinion. The majority apparently concludes that a warrant of arrest for T will permit the entry of D's apartment/home absent both probable cause and exigent circumstances. The opinion states:

Although there was no search warrant for Arboleda's apartment, the police officers were going to the apartment to arrest Gilberto, and if they had an arrest warrant for Gilberto this would have the same legal effect as a search warrant in justifying entry into Arboleda's home to effect the arrest. See e. g., *United States v. Cravero,* 545 F.2d 406, 421 (5 Cir. 1976) (on petition for rehearing), *cert. denied,* 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977); *United States v. McKinney,* 379 F.2d 259, 263 (6 Cir. 1967) (McCree, J.).

Majority op. at 989. However, every recent case in this area, including those cited by the majority, has required at least a showing of "reasonable belief" that the third party was actually in the premises entered. Thus, in its reliance on a presumption of a third-party warrant that was not even suggested by the Government, the majority is either adopting a new rule of total police discretion in this area or depriving appellant of an opportunity to show that the officers had no reasonable grounds for suspecting that his brother was in the apartment that night.

The reasonable-belief requirement, as enunciated in numerous cases, is not a mere formality that is easily satisfied. See *United States v. Harper,* 550 F.2d 610, 611, 613 (10th Cir.), *cert. denied,* 434 U.S. 837, 98 S.Ct. 128, 54 L.Ed.2d 99 (1977) (reliable informant placing suspect at that address that same day); *United States v. Cravero,* 545 F.2d 406, 421 (5th Cir. 1976) (on rehear-

ing), *cert. denied,* 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977) (officers observed suspects enter residence); *Rice v. Wolff,* 513 F.2d 1280, 1292–93 (8th Cir. 1975), *rev'd on other grounds sub nom. Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (guesswork or speculation is not enough); *United States v. Brown,* 467 F.2d 419, 423 (D.C. Cir. 1972) (officers knew residence was suspect's girlfriend's and saw person of his basic description enter); *United States v. McKinney,* 379 F.2d 259, 262–64 (6th Cir. 1967) (tips of several informants). See also *United States v. Hammond,* 585 F.2d 26, 28 & n.1 (2d Cir. 1978) (suggesting approval for counsel's concession that police may enter and search for third party as long as they have "probable cause" to believe person was there). Indeed, these cases seem to equate "reasonable belief" with "probable cause," while allowing the officers to make the judgment without consulting a magistrate. E. g., *United States v. Cravero, supra,* 545 F.2d at 421; *United States v. Brown, supra,* 467 F.2d at 424. Here, the only evidence was that the officers "believed [Gilberto Arboleda] may have been in the apartment" because they had heard he sometimes stayed there. There is nothing to indicate that this belief was at all reasonable, let alone that there was probable cause to believe that Gilberto was at his brother's, the appellant's, apartment. If this is the proper standard, we should at least remand for some findings.

But I would adopt the higher standard enunciated by the Third Circuit, requiring both a showing of probable cause to believe that the suspect is on the premises, and also exigent circumstances. See *Government of Virgin Islands v. Gereau,* 502 F.2d 914, 928 (3d Cir. 1974), *cert. denied,* 420 U.S. 909, 95 U.S. 829, 42 L.Ed.2d 839 (1975); *Fisher v. Volz,* 496 F.2d 333, 338–39 (3d Cir. 1974). See also *Rice v. Wolff, supra,* 513 F.2d at 1292 n.7 (it is not yet settled whether exigent circumstances are also required when there is an entry based on probable cause and an arrest warrant for a third party). I agree with the Third Circuit for three rea-

sons. The first is the recognition given by the Court in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), to the late Judge Leventhal's declaration that " 'Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment.' " *Id.* 445 U.S. at 587, 100 S.Ct. at 1381 (quoting *Dorman v. United States*, 435 F.2d 385, 389 (D.C. Cir. 1970) (en banc). This recognition carries with it an equation of entry to arrest with entry to search for property. In each case, the interest in preserving home privacy and sanctity is implicated and deserves constitutional protection. *See id.* 445 U.S. at 587, 100 S.Ct. 1371. *See also Rice v. Wolff, supra*, 513 F.2d at 1291. As the Court in *Payton* held, "Absent exigent circumstances, that threshold [of the home] may not reasonably be crossed without a warrant." 445 U.S. at 587, 100 S.Ct. at 1381.

The second reason for my agreement with the Third Circuit is related to the first: the underlying policy of the Fourth Amendment opposes indiscriminate searches and seizures conducted under general warrants. *Id.* 445 U.S. at 584–85, 100 S.Ct. 1371. While the probable cause requirement for entries based solely on arrest warrants affords some protection against police discretion, there remains a danger that relatively indiscriminate entries will be justified subsequently by elaborate explanations concerning probable cause. It would be safer to adopt a standard for arrests in the homes of third parties that is analogous to seizures of property: absent exigent circumstances, a warrant must specify the location to be entered in advance. *Cf. id.* 445 U.S. at 586, 100 S.Ct. 1371 (discussing, by contrast, en-

tries in the *suspect's* own home) (a search warrant standard would afford more protection, but "[i]f there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law").

My third reason is that this circuit apparently went even further in *United States v. Reed*, 572 F.2d 412, 424 (2d Cir.), *cert. denied*, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978), in requiring, for an arrest in a suspect's home absent exigent circumstances, "a warrant to arrest a suspect at home"—*i. e.*, the equivalent of a search warrant. *See also Dorman v. United States*, 435 F.2d 385, 396 (D.C. Cir. 1970) (en banc) (cited in *Reed, supra*, 572 F.2d at 424 n.10) (suggesting such a procedure). While the section of *Payton* just quoted held that a warrant specifying the location to be entered is not required for an entry in a *suspect's* home when there is already a general arrest warrant, the *Reed* case can be viewed as strong support for a search warrant requirement in cases of entries to arrest third parties, absent exigent circumstances.

To sum up, I do not believe we can fairly presume on appeal that there was an arrest warrant for appellant's brother Gilberto. Even if we do so, appellant should at minimum have the right to show the absence of reasonable grounds to believe that Gilberto was then in the apartment.[2] In addition, I would follow the Third Circuit and require a magistrate's prior finding of probable cause to believe Gilberto was at that location, since there were no exigent circumstance here.[3]

2. As added ammunition, the majority notes at footnote 5 that counsel "conceded that the appeal should be dismissed if there was an arrest warrant for Gilberto." Majority op. at 989. This "concession" not contained in any brief and made in the heat of a short oral argument with the court suggesting new points of law not briefed and made perhaps for hypothetical purposes should not bind appellant.

3. Even if we were to reject the Third Circuit rule, the majority's argument that the entry on the ledge was justified by an arrest warrant for

Gilberto is unavailing for yet another reason. In making this argument the majority suggests that, if there were such a warrant, it does not matter whether the ledge is an area where appellant had an expectation of privacy equivalent to the inside of his apartment. But if appellant *is* protected under the Fourth Amendment from entries on to the ledge, *see infra*, then federal agents making such an entry to effect any arrest must, absent special circumstances, first announce their presence and pur-

I pass to the majority's alternative holding that Arboleda had no legitimate expectation of privacy on the ledge outside his window. This question arises here because Officer Bisbee justifies the seizure of the packet of cocaine on the ledge, which led to all his subsequent actions, under the "plain view" doctrine. It is clear that a premise for the application of this doctrine is that the officer(s) be lawfully on the premises where the plain view takes place. *Coolidge v. New Hampshire*, 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971); *United States v. Berenguer*, 562 F.2d 206, 210 (2d Cir. 1977). Thus it is important to determine whether the officer could lawfully go out on the ledge as part of an effort to make a warrantless arrest of a supposed occupant of the apartment.[4]

At one time the answer to this question would have depended on whether the ledge outside appellant's apartment was "curtilage," and hence an area not subject to entry without a warrant, or at least so protected against intrusion as to make a seizure therefrom illegal. *See e. g.*, Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn.L.Rev. 349, 357 (1974). But since *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the concept of a "constitutionally protected area," *Silverman v. United States*, 365 U.S. 505, 512, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961), has yielded to the concept of "expectation of privacy," advanced in *Katz* and supported anew in *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978).

The nutshell elaboration of the concept, as expressed in *Katz*, is that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection," 389 U.S. at 351, 88 S.Ct. at 511, whereas "what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected," *id.* at 351–52, 88 S.Ct. at 511. In *Katz*, for example, the Court held that a person in a public telephone booth, visible to the outside world, nevertheless had a protected interest in the secrecy of his spoken words. *Id.* at 352, 88 S.Ct. at 511. The focus, therefore, is on the

---

pose. *See Sabbath v. United States*, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968); *United States v. Mapp*, 476 F.2d 67, 74–75 (2d Cir. 1973). It does not matter that the entry was accomplished without the use of force. *See Sabbath, supra*, 391 U.S. at 590, 88 S.Ct. at 1758. Thus, because there was no announcement here, regardless of any warrant that there may have been for Gilberto, the outcome should depend on whether the entry on the ledge was in fact an intrusion violating a reasonable expectation of privacy.

In response to this point, the majority argues that the announcement requirement applies only to *buildings*, whereas the ledge area is more analogous to a yard around a home. Majority op. at n.6. They suggest that I would prevent officers from even approaching the front door of a home without a prior announcement. *Id.* This analogy is inapposite both because an upper-floor ledge, unlike a yard, *is* part of a building and because it is not all clear that an officer who approaches a front door for purposes of knocking violates any "reasonable expectation of privacy." It is the latter factor that controls the applicability of the announcement requirement. *See United States v. Fluker*, 543 F.2d 709, 716 (9th Cir. 1976) ("Thus the critical question before this Court is whether, under the particular circumstances of this case, appellant Young can be said to have had a

'reasonable expectation of privacy' with respect to the corridor area separating the door of his apartment from the outer doorway of the apartment building."). In *Fluker*, the court concluded that the requirement did apply to the particular corridor area under consideration.

4. Assuming that the majority is following this analysis here, it is not at all clear why its opinion focuses in part on appellant's "legitimate expectation of privacy with respect to an object which he threw outside the apartment with the objective of getting rid of it." Majority op. at 991. Leaving aside its entirely unsupported assumption about appellant's intent, this passage suggests incorrectly that it is helpful here to inquire into his privacy interest in the object seized. Assuming that the package on the ledge was sufficiently "incriminating" to satisfy one of the basic plain view tests, *see United States v. Berenguer*, 562 F.2d 206, 210 (2d Cir. 1977), appellant cannot claim a privacy interest in the package, *see United States v. Ochs*, 595 F.2d 1247, 1256–58 (2d Cir. 1979) (Friendly, J.), *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979). But the government must go further and show that the particular intrusion by its agent that led to the discovery of this incriminating evidence was itself lawful.

*particular* intrusion being made and on whether the individual had a reasonable expectation of protection from that sort of intrusion.

Here, the agent who had the plain view of the cocaine was climbing on a two-foot ledge and peering into the windows of appellant's apartment. I would hold that an apartment dweller should be protected from such intrusions because of his "reasonable expectation of privacy." If appellant was so protected, then it was unlawful for the officer to enter the ledge area prior to the making of a warrantless arrest, under *Payton v. New York, supra,* and *United States v. Reed, supra.*

The majority says that "[t]here is no evidence that Arboleda exercised any exclusive control over the ledge, which ran along the entire front of the building and was accessible to other tenants from their windows and the fire escape." Majority op. at 991. But access from the fire escape, separated from the two-foot-wide ledge by a three-foot fence, over which Detective Bisbee had to climb, is immaterial, because the ledge itself was not a passageway. No one absent an emergency would use such a narrow ledge to walk on—it was certainly not designed for any such use—so it cannot be treated like a hall, stairwell, garage, or the like, as in *United States v. Penco,* 612 F.2d 19, 24–25 (2d Cir. 1979). And I find no evidence in the record that this ledge was accessible to any other tenants except by way of the fire escape.

Nor is it very important that the general ledge area was visible from the street. A living room in a home may be visible from a distance through a window, but that fact cannot justify a warrantless entry by the police to view the same room up close. The difference between a long-distance view and an actual entry is suggested by the fact that the package of cocaine might never have been seen, or recognized as incriminating evidence, from any vantage point other than the ledge itself.[5] It is noteworthy in any event that the police were summoned to the building by someone who, seeing Bisbee creeping along the ledge and his peeping-Tom activities, had reported a burglary in process. Evidently that person thought that the apartment dwellers had an expectation of privacy in respect to the ledge.

In short, when Bisbee climbed over the fence from the fire escape on to the ledge, he intruded on an area in which Arboleda had a reasonable expectation of privacy. If Bisbee had at that time no warrant, there were no exigent circumstances, and there was no consent for him to be there, he had no "legitimate reason for being present," and the plain view doctrine is inapplicable. *Coolidge v. New Hampshire, supra,* 403 U.S. at 466,[6] 91 S.Ct. at 2038.

I would accordingly reverse.

---

**5.** The undisputed testimony of Agent Bisbee was that appellant threw the "package down toward like underneath the fire escape which is over the ledge itself by several inches." The package "hit the bar from the fire escape and rested there on the ledge." There is no indication in the record that the package would have been visible from any public place, including even the fire escape. Even if there were, it is not at all clear that this fact would justify the seizure since the officer was, in my view, intruding on a private sphere when he actually saw the package.

Insofar as the opinion relies on Judge Platt's statement that Bisbee took the package "from the fire escape," *see* Majority op. at 991, such reliance is unjustifiable. I would agree with the majority that if Arboleda had thrown the package on to the fire escape, accessible to all other dwellers on that side of the building, he would be out of luck. But that is not the evidence here.

**6.** *United States v. Anderson,* 552 F.2d 1296 (8th Cir. 1977), relied on below but not by the majority, is clearly not controlling. In that case, officers knocked on the front door of a house seeking to question a suspect. They got no answer but saw a light on inside and heard a dog barking in back. They went around back "to determine if there was someone with the barking dog," *id.* at 1298, and saw incriminating evidence inadvertently through a window. Although the court observed that "private property immediately adjacent to a home is entitled to the same protection against unreasonable search and seizure as the home itself," it justified this admitted intrusion on the basis of the "agents' legitimate objective of finding [the suspect] to question him." *Id.* at 1299. If the entry on the ledge is an intrusion on a protected area, the *Anderson* argument is rendered inapplicable here by *Payton v. New York, supra,* and *United States v. Reed, supra.*

On Petition for Rehearing

PER CURIAM:

■ Appellant has filed a petition for rehearing in which he alleges, *inter alia*, that an oral communication between counsel for the Government and the defendant which was not in the record gave the defense reasonable ground to believe that the Government would not contend that the officers had a warrant for Gilberto's arrest. We gave the Government an opportunity to answer. Although it does not admit that the conversation was of the tenor asserted by the defendant, it agrees that in fact there was no warrant for Gilberto's arrest but contends that defendant should not now be allowed to question the officer's presence on the ledge since he did not do so in the district court. While there may well be merit in this position, see *United States v. Knuckles*, 581 F.2d 305, 310 (2 Cir. 1978); *United States v. Braunig*, 553 F.2d 777, 780 (2 Cir. 1977), we prefer to rest our decision on the adequate and independent ground developed in Part II of the opinion. When Oscar Arboleda, in his own words, "tossed" the aluminum foil package "out the window", he abandoned any reasonable expectation of privacy. See *Rawlings v. Kentucky*, —— U.S. ——, ——, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980). The dissent concedes that if the package had come to rest when it hit the fire escape, the defendant would have been "out of luck". 997 n. 5. Fourth Amendment protections did not spring back into force when the package fell from the fire escape to the ledge.

The petition for rehearing is denied.

OAKES, Circuit Judge (dissenting):

I adhere to my previous opinion and therefore dissent from the denial of rehearing and affirmance of the judgment on the second alternative ground advanced in the original opinion. I take it that the majority's sole reliance on the second alternative ground is an abandonment of its original position that somehow the defendant had an obligation to raise the issue whether officers who arrested him in his home had a warrant for Gilberto, a third person, who was not found in the home. Surely, at least, the admission of the Government that there was in fact no warrant for Gilberto's arrest demonstrates the validity of the proposition that once a defendant has produced sufficient evidence that he was arrested or subjected to a search without a warrant, the rule should be, as I believe the basic federal rule is, that the burden shifts to the Government to justify the warrantless arrest or search. *See* at 993 (Oakes, J., dissenting).

As for the alternative ground—that Arboleda abandoned any reasonable expectation of privacy when he tossed the package onto the two–foot ledge outside of his apartment—I think the subject is adequately covered in the original dissenting opinion. The fact that the package, at least according to the detective, hit the fire escape before it came to rest on the ledge is wholly immaterial. The case is not one involving a package being thrown onto an area as to which there was no expectation of privacy. If my back yard is enclosed by a fence that shields it from an alleyway and I throw an object against the fence that remains in the yard, I do not think that any officer who happens to come down the alleyway at the time I throw the object and even sees me throw it has a right to climb the fence to determine what that object is. *See Coolidge v. New Hampshire*, 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971).

I would still reverse.