UNITED STATES of America

v.

Joel JOSEPH a/k/a "The Joker"

No. 03 CR. 475(SCR).

United States District Court,
S.D. New York.

April 30, 2004.

Barry A. Weinstein, Goldstein, Weinstein & Fuld, Bronx, NY, for Defendant.

Marc O. Litt, Assistant United States Attorney, New York, NY, for Plaintiff.

## MEMORANDUM DECISION AND ORDER

ROBINSON, District Judge.

### I. *INTRODUCTION:*

Joel Joseph (the "Defendant") was arrested by the United States Secret Service on February 26, 2003 and was subsequently indicted on charges related to credit card fraud and bank fraud. The Defendant has made a motion to suppress (the "Defendant's Motion") (1) certain statements, which he is alleged to have made to United States Secret Service Agents following his arrest, and (2) a certain photographic identification, which was

made prior to the arrest. The Government contends, and the Defendant has not opposed, that following his arrest the Defendant made a number of statements admitting his involvement in a conspiracy to commit credit card fraud, including:

> He stated that he obtained a skimming device from an individual known to him as "Idris". He described Idris as a male in his late twenties, between 5'6" and 5'7" with a regular build. Mr. Joseph told us that Idris had a French accent and that he thought Idris was of Moroccan descent. Mr. Joseph said that he had met Idris while on vacation in Canada in 1995 or 1996 and that two years ago, in 2001, Idris had come to stay with him. According to Mr. Joseph, it was during that time that Idris provided him with a skimming device. Mr. Joseph stated that he gave the skimming device to a girl named Mareana who worked in White Plains, that she kept the box for about a week, and then returned it to Mr. Joseph. Mr. Joseph told us that Idris subsequently connected the skimming device to his computer.

(Government's Opposition, Page 5).

Additionally, the Government submits, and the Defendant has not contested, that on October 18, 2001, Special Agent Michael Sweeney of the United States Secret Service ("Special Agent Sweeney") showed a photographic array, containing six photographs, including a photograph of the Defendant, to a civilian witness. (March 31, 2004 Suppression Hearing Transcript (the "Transcript"), Page 79–81). The Government contends that the witness was given, word-for-word, certain cautionary instructions[1], but nothing else was said to the

---

1. The witness was instructed as follows: "You will be asked to look at a group of photographs. The fact that the photos are shown to you should not influence your judgement [sic] in any way. You should not consider nor guess that the photographs contain the pic-

witness before the witness viewed the photographic array. (*Id.* at 81). After viewing the array, the witness identified the Defendant and explained how the witness knew the person depicted in the photograph. (*Id.*) Following the testimony at the suppression hearing, this Court allowed the parties oral argument at which time the Defendant essentially withdrew his claim regarding the photographic identification. (*Id.* at 109).

The Defendant's Motion makes three primary arguments: (1) the statements of the Defendant should be suppressed because the Defendant was not properly advised of his *Miranda* rights; (2) the statements of the Defendant should be suppressed because such statements were made in violation of his right to counsel under the Fifth and Sixth Amendments; and (3) all identification testimony must be suppressed because the photographic identification procedure was conducted in a suggestive manner. The Government opposed the Defendant's Motion ("Government's Opposition"). In accordance with the decisions by the Supreme Court and Second Circuit, including without limitation, *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) and *United States v. Mathurin*, 148 F.3d 68 (1998), this Court found that the Defendant had made sufficient allegations to create specific factual questions, which necessitated a suppression hearing. A suppression hearing was held on March 31, 2004.

## II. *ANALYSIS:*

### A. BURDEN OF PROOF:

■ It is well established that the burdens of production and persuasion general-

ly rest upon the movant in a suppression hearing. *See e.g. United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir.1980); *United States v. Galante*, 547 F.2d 733, 738 (2d Cir.1976). However, both the Supreme Court and Second Circuit have held that there are situations where the burden of persuasion at a suppression hearing can shift to the Government to prove, by a preponderance of the evidence, that the proffered evidence is valid. *See e.g. Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) ("the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary."); *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir.1997) ("The prosecution bears the burden of demonstrating by a preponderance of the evidence that a confession was voluntary."); *United States v. Anderson*, 929 F.2d 96, 98 (2d Cir.1991) ("The prosecution has the burden of establishing by a preponderance of the evidence that a suspect waived his *Miranda* rights, and that his confession is truly the product of free choice.").

■ In the case at bar, the Defendant has made Fifth and Sixth Amendment challenges to the Government's conduct. Therefore, although the Defendant is the moving party, the burden shifts to the Government to establish, by a preponderance of the evidence, that (a) the Defendant was properly advised of his *Miranda* rights, and (b) that the Defendant's right to counsel, under the Fifth and Sixth Amendments, was not violated.

### B. SUPPRESSION OF POST–ARREST STATEMENTS:

In connection with his arguments to suppress the statements made to the law en-

---

ture of the person who committed the crime. You do not have to identify anyone. It is just as important to free innocent persons from suspicion as to identify guilty parties. Keep in mind hairstyles, beards and mustaches are

easily changed. Please do not indicate to other witnesses that you have or have not made an identification." (Government's Opposition, Page 11 and Exhibit A).

forcement officers, the Defendant first claims that he was not properly Mirandized, in violation of the Fifth Amendment. Second, the Defendant argues that he was interrogated in the absence of counsel, in violation of his Fifth and Sixth Amendment rights.

### 1. *Miranda Rights:*

■ It is well established that the Fifth Amendment protects a' defendant against compelled self-incrimination and that before a suspect may properly be subjected to custodial interrogation, he or she must be informed that he or she has the right to remain silent, that any statement he or she makes may be used as evidence against him or her, and that he or she has the right to have counsel present. *See e.g., Miranda v. Arizona,* 384 U.S. 436, 467–71, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Both the Supreme Court and the Second Circuit have made it clear that the purpose of the *Miranda* warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights and that any waiver of those rights is a knowing, intelligent and voluntary waiver. *See e.g. Miranda* at 467–73, 86 S.Ct. 1602; *Terry v. Le Fevre,* 862 F.2d 409, 412 (2d Cir.1988). Furthermore, the Second Circuit has stated that "[i]t is well established that once an arrested person has received a proper *Miranda* warning, the fact that questioning is stopped and then later resumed does not necessarily give rise to the need for a new warning." *United States v. Banner,* 356 F.3d 478, 480 (2d Cir.2004). In *Banner,* the Second Circuit held that if the suspect "has been sufficiently informed of his or her constitutional rights, his or

her *Miranda* rights have been vindicated." *Banner* at 480.

In his motion papers, the Defendant submitted that his post-arrest statements to the Government should be suppressed because:

> [w]hile in custody, and being driven by the agents to White Plains, [the Defendant] was interrogated by them without having been properly advised of [his] *Miranda* Warnings. [ ] [The Defendant] made certain statements to the agents in their vehicle, and in their office in White Plains approximately one half to three quarter of an hour later. [The Defendant] was not properly advised of [his] *Miranda* Warnings at either location.

(Defendant's Affidavit, ¶ 3). An affidavit from Special Agent Sweeney contradicted the Defendant's assertion, stating that "[a]nother Special Agent notified Mr. Joseph of his *Miranda* rights by reading to him an advice of rights card typically used by USSS Special Agents." (Sweeney Affidavit (Exhibit 1 to Government's Opposition), ¶ 4). Special Agent Sweeney further declared that "Mr. Joseph acknowledged that he understood those rights." *Id.* This factual conflict gave rise to the need for the suppression hearing.[2]

Four witnesses testified during the suppression hearing: Special Agent Vincent Tutoni of the United States Secret Service ("Special Agent Tutoni"), Richard Landes, Esq. ("Mr. Landes"), Special Agent Michael Stone of the United States Secret Service ("Special Agent Stone") and Special Agent Sweeney. Special Agent Sweeney was the lead agent and Special Agents Stone and Tutoni assisted with the arrest.

---

**2.** An assertion by a defendant that *Miranda* warnings were not given, when the Government asserts the contrary, creates a specific factual dispute. Both the United States Supreme Court and the Second Circuit have

held that such a dispute cannot be properly resolved without an evidentiary hearing. *See Colorado v. Connelly,* 479 U.S. 157, 168–69, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) and *United States v. Mathurin,* 148 F.3d 68 (1998).

The Defendant was arrested following an unrelated, criminal proceeding at 100 Centre Street in New York, New York, Mr. Landes was present during the execution of the federal arrest warrant because he was representing the Defendant on the unrelated, state narcotics charges.

The three Secret Service Agents testified that (a) Special Agent Tutoni read the Defendant his *Miranda* rights from an advice of rights card typically used by the United States Secret Service (the "Secret Service")[3] and (b) that the Defendant acknowledged that he understood those rights at the time he was arrested at 100 Centre Street. Special Agent Tutoni testified that immediately after handcuffing the Defendant he took out a Secret Service issued, *Miranda* warning card and read the Defendant his rights verbatim from that card. He then asked the Defendant if he understood his rights, to which the Defendant replied "Yes, I understand." (Transcript, Pages 9–11 (direct), 27 (cross-examination) and 35 (re-direct) (consistent testimony)). Special Agent Stone testified that he (a) saw Special Agent Tutoni reading from a card, (b) heard a *Miranda* warning being given and (c) heard the Defendant acknowledge that he understood his rights. (*Id.* at 60–62 (direct), 65–67 (cross-examination) (consistent testimony)). Likewise, Special Agent Sweeney stated that he both saw and heard Special Agent Tutoni notify the Defendant of his *Miranda* rights and heard the Defendant acknowledge that he understood those rights. (*Id.* at 85–87 (direct), 95–97 (cross-examination) (consistent testimony)).

Mr. Landes, who was present at the time of the Defendant's arrest at 100 Centre Street, testified that he did not see or hear the *Miranda* warning being given and did not hear the Defendant acknowledge that he understood his rights. (*Id.* at 43–44). However, Mr. Landes admitted that he was engaged in a discussion with one of the Secret Service Agents[4] contemporaneously with the time when the Special Agents testified that Special Agent Tutoni was informing the Defendant of his *Miranda* rights. (*Id.* at 47–48). Further, Mr. Landes conceded that his attention was more focused on the conversation he was having with the Secret Service Agent than on the process of the Defendant being arrested. (*Id.* at 53–55).

■ This Court finds that the testimony elicited at the suppression hearing establishes, by a preponderance of the evidence, that Special Agent Tutino read the Defendant his *Miranda* rights from the Secret Service's standard-issue "advice of rights card" and that the Defendant acknowledged that he understood those rights. Based upon those *Miranda* warnings and his acknowledgment, the Defendant was

---

**3.** A copy of that "advice of rights card" was entered into evidence at the suppression hearing as "Government's Exhibit 1," which provides that: "[Front side] (1) You have the right to remain silent. (2) Anything you say can and will be used against you in a court of law. (3) You have the right to talk to a lawyer and have him present with you while you are being questioned. (4) If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish. (5) You can decide at any time to stop the questioning and not answer any questions or make any statements. [Back side] After the warning and in order to secure a waiver, the following questions should be asked and an affirmative reply secured to each question. (1) Do you understand each of these rights I have explained to you? (2) Do you wish to talk to us now?"

**4.** Mr. Landes was unable to identify which one of the Secret Service Agents he was speaking with, but Special Agent Sweeney testified that he was the Agent who spoke with Mr. Landes. (Transcript, Page 45–46 (Mr. Landes) and Page 85–86 (Special Agent Sweeney)).

aware, or should have been aware, of his constitutional rights when he proceeded to speak to the Secret Service Agents in Special Agent Tutino's vehicle en route to White Plains and in the Secret Service's office in White Plains.

■  Alternatively, the Defendant argues that even if his *Miranda* rights were read to him at 100 Centre Street and the Defendant acknowledged that he understood them, "acknowledgment" of understanding one's rights and "waiver" of those rights may be separate events. (Transcript, Page 117–121). Thus, the Defendant argues that even if he acknowledged his rights, he did not knowingly "waive" those rights and he should have been "re-Mirandized" both in the vehicle and at the Secret Service's White Plains Office. The Defendant has not set forth in writing, or oral argument, any case law to support this "multiple *Miranda*" rule. The case law on the subject is directly inapposite to the Defendant's position. *See e.g. Banner.* The Court accepts the Defendant's argument that "understanding" and "waiver" may in some instances be separate events; however, in this case, the Court finds that (a) the Defendant acknowledged his understanding of his rights at 100 Centre Street when Special Agent Tutino read him his rights and asked if he understood them and (b) waiver occurred, when after having his rights read to him, and specific advice from Mr. Landes[5], the Defendant made incriminating statements to the Secret Service Agents.

The standard advocated by the Defendant is not a legal necessity under *Miranda* and its progeny. If the Court were to require law enforcement to remind a defendant of his *Miranda* rights every time the defendant spoke, it would be unduly burdensome and would have a chilling affect on law enforcement's ability to gather information; this is not what the law requires. Rather, the law requires that a defendant be sufficiently informed of his or her constitutional rights and that the Defendant acknowledges those rights; if this is done, the defendant's *Miranda* rights are vindicated. *Banner* at 480. In the case at bar, this Court finds that the Defendant was informed of his constitutional rights and he chose to waive his right to remain silent; in the process he made incriminating statements. Based upon the testimony at the suppression hearing, this Court has determined, by a preponderance of the evidence, that the Defendant's *Miranda* rights were vindicated.

Accordingly, the Defendant's Motion to suppress his statements on Fifth Amendment grounds is denied.

### 2. *Right to Counsel:*

In addition to the alleged violation of his *Miranda* rights, the Defendant argues that his post-arrest statements should be suppressed because they were made in violation of his right to counsel. In support of this position, the Defendant advances two separate arguments: (1) his statements were made in violation of his Sixth Amendment right to counsel because he was represented by counsel, Mr. Landes, at the time the statements were made; and (2) the Defendant's Fifth Amendment right to counsel was violated by the Government because Mr. Landes advised him not to speak to the Secret Service Agents and asked the Secret Service Agents not to speak to the Defendant.

---

**5.** As discussed more fully below, Mr. Landes testified that he advised the Defendant not to speak to the Secret Service Agents. (Transcript, Page 42–43). The Secret Service Agents conceded during their respective testimony that Mr. Landes gave this warning. (*Id.* at 11 (Tutoni), Page 61 (Stone) and Page 86 (Sweeney)).

### a. *Sixth Amendment Right to Counsel:*

■ To the extent the right to counsel has attached, the Sixth Amendment precludes as inadmissible (by the Government) statements obtained by the Government outside the presence of a defendant's counsel; unless the statements are accompanied by a waiver of this right. *United States v. Yousef,* 327 F.3d 56, 140 (2d Cir.2003). In *McNeil v. Wisconsin,* 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), the Supreme Court held that the Sixth Amendment right to counsel is *offense specific. Id.* at 175, 111 S.Ct. 2204. More specifically, the Court stated that:

> [The Sixth Amendment Right to Counsel] cannot be invoked once for all future prosecutions, for it does not attach until the prosecution is commenced, that is, 'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'

*Id.* at 175, 111 S.Ct. 2204 (citing *United States v. Gouveia,* 467 U.S. 180, 188, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984)). As recent as 2001, the Supreme Court reiterated the view that the Sixth Amendment right to counsel is "offense specific." *Texas v. Cobb,* 532 U.S. 162, 164–168, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001). In that case, the Supreme Court held that "when the Sixth Amendment right to counsel attaches, it does encompass offenses that, even if not formally charged, would be considered the same offense under the *Blockburger* test."[6] *Id.* at 173, 121 S.Ct. 1335. The Second Circuit has followed the Supreme Court and has acknowledged that the Sixth Amendment does not prohibit the questioning of an individual regarding other crimes as to which the right to counsel has not yet attached. *See e.g. United States v. Mapp,* 170 F.3d 328, 334 (1999).

The Defendant asserts that at the time of his arrest on the federal charges, he was at the courthouse at 100 Centre Street, New York, New York facing unrelated drug charges in state court. During that state court proceeding, the Defendant was represented by Mr. Landes. Mr. Landes testified at the suppression hearing that, at the time of his federal arrest, he advised the Defendant not to speak to the Secret Service Agents. (Transcript, Page 42–43). The Defendant contends that Mr. Landes's warning went unheeded and that the Defendant's Sixth Amendment rights were violated.[7] The Secret Service Agents all stated during their testimony that Mr. Landes gave this warning. (*Id.* at 11 (Tutoni), 61 (Stone) and 86 (Sweeney)). However, the Secret Service Agents also testified that they were aware that Mr. Landes explicitly stated that he would not be representing the Defendant in connection with the federal fraud charges. (*Id.* at 42 (Mr. Landes); 11 (Special Agent Tutoni); 61 (Special Agent Stone); 85 (Special Agent Sweeney)). Accordingly, Special Agent

---

**6.** The *Blockburger* test provides that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

**7.** The Sixth Amendment to the Constitution, Rights of the Accused, provides that: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and *to have the assistance of counsel for his defense."* U.S.C.S. Const. Amend. 6 (2003) (emphasis added).

Sweeney testified that because Mr. Landes was not representing the Defendant on the federal charges, he understood that the Defendant was not represented by counsel and his right to counsel on the federal charges had not yet attached. (Id. at 87). Additionally, Mr. Landes claims that he said to the Secret Service Agents, as they led the Defendant down the corridor, "No questions, guys, no questions." (*Id.* at 43). Each of the Secret Service Agents testified that he did not hear Mr. Landes say this, or anything, when they were taking the Defendant to the elevator for transport. (*Id.* at 35 (Special Agent Tutoni)); 62 (Special Agent Stone); 86 (Special Agent Sweeney).

■ There is no question, and the Defendant has not contested the fact, that the two offenses, (a) federal charges for credit card fraud and bank fraud and (b) state charges for narcotics, are two separate, unrelated offenses. Further, while there is no dispute that the right of counsel had attached in the state drug case, this Court finds that no attachment had taken place in connection with the federal charges at the time the Defendant made the statements in question. As set forth above, the Sixth Amendment right to counsel is "offense specific" and it was reasonable, based upon Mr. Landes's statement that he would not be representing the Defendant, for the law enforcement officers to conclude that the Defendant was not represented by counsel on the federal charges. Therefore, Mr. Landes's admonitions to the Defendant—not to speak to the Secret Service Agents—and to the Secret Service Agents—not to speak to the Defendant—were of no legal consequence. Accordingly, the Defendant's Motion to suppress his post-arrest statements on Sixth Amendment grounds is denied.

*b.   Fifth Amendment Right to Counsel:*

■ Alternatively, the Defendant argues that a Fifth Amendment right to counsel exists, which, unlike the Sixth Amendment right to counsel, is not offense specific. More particularly, the Defendant quotes *United States v. Santiago*, 3 F.Supp.2d 392 (S.D.N.Y.1998) (Scheindlin, J.), which provides that:

> The Fifth Amendment privilege against self-incrimination also provides a right to counsel. Once a suspect is in 'custody' he or she must be informed of the right to an attorney. Once that right is exercised, no further questioning may occur in the absence of counsel. See generally, *Edwards v. Arizona*, 451 U.S. 477, 484, 101 S.Ct. 1880, 68 L.Ed.2d 378[ ] (1981); *Minnick v. Mississippi*, 498 U.S. 146, 150, 111 S.Ct. 486, 112 L.Ed.2d 489[ ] (1990). Unlike the Sixth Amendment right, the right to counsel is not offense specific: Once it is invoked, a suspect can no longer be questioned about any matter in the absence of counsel. See *Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704[ ] (1988).

*Id.* at 395. Unlike the Sixth Amendment, the Fifth Amendment does not expressly guarantee a right to counsel. What the Fifth Amendment provides is a right to notice against self-incrimination such that once a suspect is in police custody and subject to interrogation, the police must inform the suspect of his right to contact an attorney and to have that attorney present during the questioning. *Miranda v. Arizona*, 384 U.S. 436, 467–71, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). At this point the suspect's Sixth Amendment rights come into play. If a suspect asserts his *Miranda* rights, the police interrogation must cease until his counsel is present. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *see*

*also Minnick v. Mississippi,* 498 U.S. 146, 153, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990).

This Court does not dispute the statement by the *Santiago* Court that 'the right to counsel' may be a part of the Fifth Amendment privilege against self-incrimination. However, contrary to the Defendant's position, that right is not implicated by the facts of the case at bar. While it is true that the Defendant was in custody when he made the statements to the law enforcement officers, there has been no allegation, either in the motion papers or at the suppression hearing, that the Defendant invoked his right to counsel by requesting an attorney. Instead, the Defendant appears to rely on the argument that when Mr. Landes issued his admonitions, the Defendant's "Fifth and Sixth Amendment protections were firmly put in place." (Defendant's Motion, Page 4). The Defendant does not cite any case law in support of this theory.

■ There are two ways that the Defendant's right to counsel could have materialized—one pursuant to the Fifth Amendment and one pursuant to the Sixth Amendment. First, the Defendant could have invoked his Fifth Amendment rights and exercised his right to request an attorney (on the federal credit card fraud and bank fraud charges) at which point the interrogation by the federal officers would have had to cease. *Michigan v. Jackson,* 475 U.S. 625, 635, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). As discussed in the Section II(B)(1) above, the Defendant claims that he was not "properly Mirandized"; however, he does not make any claim that he tried to exercise his *Miranda* rights during the interrogation and request the presence of an attorney. Further, this Court has found that Special

Agent Tutoni informed the Defendant of his *Miranda* rights, including his right to counsel. Second, an attorney for the Defendant could have made an appearance on the federal charges, at which point, upon notice of such appearance, the federal officers would have had to cease questioning outside the presence of the Defendant's attorney (Sixth Amendment right). For example, had Mr. Landes said, "I am Mr. Joseph's attorney and I will be representing him on the federal charges.", the federal agents would not have been permitted to question the Defendant without Mr. Landes's presence or consent. However, Mr. Landes said just the opposite—that he would not be representing the Defendant on the federal charges.

For all of the reasons set forth above, this Court finds that the Defendant's right to counsel, under either the Fifth or Sixth Amendment, was not violated. Therefore, the Defendant's Motion to suppress his statements on right to counsel grounds is denied.

C.  SUPPRESSION OF IDENTIFICATION TESTIMONY:

The Defendant has also moved to suppress a photographic identification on the ground that the photographic identification procedure used by the Government was presented in a suggestive manner, which created a substantial possibility of a mistaken identification. As noted above, during the Defendant's counsel's "closing argument" at the suppression hearing, he essentially withdrew his challenge to the photographic identification [8]; however, this Court will address this issue anyway. There are three prongs to the Defendant's argument regarding the photographic ar-

---

**8.** Defense counsel stated: "The photographs I'm not going to comment on. There was nothing apparently untoward about them. The array seems to be fine and that's really not the issue that I'm going to address here." (Transcript, Page 109).

ray. First, the Defendant contends that "the copies of the array are difficult to examine because of the poor quality." (Defendant's Motion, Page 6). Second, the Defendant claims that the photograph of the Defendant "stands out from the other individuals." (Id.) Third, the Defendant asserts that "neither counsel, nor the defendant was present during the presentation of the photos to the identifying witness. We are unable therefore, to make any representations regarding what was said during the presentation of the arrays." (Id. at 6–7).

■ It is well established that a defendant has a due process right not to be the subject of suggestive police identification procedures, which might create a "very substantial likelihood of irreparable misidentification." *See e.g. United States v. Concepcion*, 983 F.2d 369, 377 (2d Cir. 1992) (quoting *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)) *see accord Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Manson v. Brathwaite*, 432 U.S. 98, 106 n. 9, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). This principal applies to both showups and photographic identifications. A number of factors are taken into account when determining whether the photographic array was fair, including the size of the array, the manner of presentation by the police officers and the contents of the array. *Concepcion* at 377. If these factors are satisfied, the "principal question is whether the picture of the accused...so stood out from all of the other photographs as to 'suggest to an identifying witness that [that person] was more likely to be the culprit.'" *Id.* (quoting *United States v. Archibald*, 734 F.2d 938, 940 (2d Cir.1984)). In the case at bar, the

photographic array consisted of six photographs. The Second Circuit has held that six photographs is an acceptable number for a photographic identification array. *See e.g. United States v. Bennett*, 409 F.2d 888, 898 (2d Cir.), *cert denied*, 396 U.S. 852, 90 S.Ct. 117, 24 L.Ed.2d 101 (1969). Thus, the Defendant has concentrated his challenge of the photographic identification on the "manner of presentation" and the "contents of the array."

With respect to the Defendant's first contention, that the copies of the photographic array were difficult to examine because of poor quality, this Court has reviewed the array, which was attached as Exhibit A to the Government's Opposition, and found it to be of sufficient quality. This Court did not find the photographic array difficult to examine and this contention by the Defendant fails.

■ Alternatively, the Defendant claims that the Defendant stands out from the other individuals in the photographs. As a threshold matter, it should be noted that all six of the individuals pictured in the photographic array (1) are African–American males; (2) appear to be approximately the same age; (3) have long hair styled in dreadlocks; and (4) have goatee mustaches/beards. After reading the Defendant's Motion, this Court reviewed the photographs to determine if one of the photographs "stands out", as alleged by the Defendant, and did not find that to be the case. In fact, while performing the examination, it was not immediately clear to the Court which one of the six photographs was the Defendant.[9] Accordingly, this Court finds that the photographic procedure was not unduly suggestive and the second prong of the Defendant's motion to

---

**9.** The Government's Opposition indicates that the Defendant is pictured in photograph # 6 in the photographic array.

suppress the photographic identification fails.

Finally, with regard to the third prong of the Defendant's Motion to suppress the photographic identification, the only argument offered by the Defendant is the mere assertion that neither the Defendant nor his counsel was present for the photographic array. Beyond that bare statement, there is no allegation of impropriety or suggestive conduct by the law enforcement officers. The Defendant did not elicit any information at the suppression hearing, which would cast doubt on the propriety of the identification procedure. To the contrary, during the suppression hearing, Special Agent Sweeney testified that he had conducted the photographic identification procedure with a civilian witness, who identified the Defendant. (Transcript, Page 79). Special Agent Sweeney also stated that the HIDTA (High Intensity Drug Trafficking Area) Task Force for Westchester County prepared the photographic array[10] of the Defendant and five similar looking individuals. (*Id.* at 79). Further, Special Agent Sweeney maintained that when the civilian witness appeared for the identification, he (Special Agent Sweeney) "read word-for-word the sentences on the bottom" of the photographic array to the witness.[11] (*Id.* at 81). Special Agent Sweeney testified that he did not say anything else to the witness about the photographic array before he presented it to the witness. (*Id.*). After the presentation of the photographic array, the witness identified picture number six (the Defendant) as the individual known as "Joker." (*Id.*)

Accordingly, all three prongs of the Defendant's arguments to suppress the photographic identification of the Defendant fail and the Defendant's Motion to suppress the photographic identification must be denied.

### III. CONCLUSION:

For all of the reasons set forth more fully above, the Defendant's Motion to suppress his post-arrest statements and a photographic identification are denied.

It is so ordered.

---

10. A copy of the photographic array was entered into evidence during the Suppression Hearing as ("Government's Exhibit 2").

11. At the bottom of the photographic array, the language quoted in Footnote # 1 appears.